## Deen's Appeal.
## Taylor's Appeal.

Argued March 13, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*J. Dress Pannell,* for appellants.

*Samuel Handler,* Assistant District Attorney, with him *Carl B. Shelley,* District Attorney, and *Earl V. Compton,* Special Assistant District Attorney, for appellee.

OPINION BY CUNNINGHAM, J., April 21, 1939:

The questions of law involved upon these appeals are identical and will therefore be disposed of in a single

opinion; they arose out of these circumstances: Upon the petition of the District Attorney of Dauphin County a grand jury was ordered to convene in that county on December 15, 1938, for the purpose of investigating, under the supervision and direction of SCHAEFFER, President Judge of the Twenty-third Judicial District, specially presiding in the court below by direction of the Supreme Court, certain alleged unlawful acts and misdemeanors in office on the part of some officers of the State government and others. See *Dauphin County Grand Jury Investigation Proceedings (No. 1)*, 332 Pa. 289, 331, and order at page 341, 2 A. (2d) 783.

In his charge to that grand jury the presiding judge referred in detail to the contents of the petition of the district attorney and, inter alia, said: "One of the matters for your consideration shall be the charge that certain officers of the State government and others did unlawfully conspire together to require state, county, city and other public officials and employees to contribute a part of their salary or wages to political committees or others under threat and penalty of dismissal or loss of promotion or other valuable thing for noncompliance with such request......The charge now before us is the common law charge of criminal conspiracy to extort money."

During the course of the investigation, the representatives of the Commonwealth issued, by specific authority of the court, a subpoena duces tecum directed to Carl K. Deen, the resident secretary of the Democratic State Committee and one of the appellants herein, in which he was commanded, in the language of the writ, to appear before the grand jury on January 26, 1939, "to testify to all and singular those things which you shall know in a certain investigation of charges of malfeasance in office, bribery, conspiracy, corrupt solicitation, fraudulent conversion, extortion, etc., in our said court depending," and to bring with him the following:

"(1) All accounts relating to the county charges and

payments under the plan which was in effect from 1936 to 1938;

"(2) The whole of all correspondence files with all the county committees, particularly the Dauphin County Committee, relative to financial matters and such correspondence relating to increases in pay or dismissals of State employees;

"(3) The complete file of correspondence sent to and received from Charles Graham and the expense vouchers submitted by Mr. Graham;

"(4) Expense accounts;

"(5) The correspondence with other persons relating to Mr. Graham or his activities while with the State Committee;

"(6) A copy of by-laws of the Democratic State Committee; and

"(7) The records of the committee showing memberships in the Finance Committee of 1937."

A similar subpoena duces tecum was also directed to the other appellant, Frank Taylor, the cashier and an employee of the same committee.

At the time designated in the subpoenas both appellants appeared before the grand jury but stated that, under advice of counsel, they had not brought with them the papers and records specified in the subpoenas. Appellants and their counsel, along with counsel for the Commonwealth, then appeared in open court before the presiding judge. The officer charged with the duty of serving the subpoenas was sworn and formal proof of service made. Counsel for the Commonwealth then moved that each appellant be adjudged in contempt of court for refusing to produce the records and documents specified in the subpoenas and that they "be committed until they have purged themselves of such contempt."

Thereupon, counsel for appellants presented petitions to quash the subpoenas. The petitions set forth, in substance, that the subpoenas were "illegal and void" in that they did not "describe with reasonable certainty or

precision" the papers and records referred to therein, and in that "the disclosure of the papers and records, sought to be produced and exhibited......would constitute an unlawful search and seizure of property, and an invasion of the constitutional rights of privacy."

After extended argument, the presiding judge, deeming the fourth item of the subpoenas, reading, "(4) Expense accounts," too indefinite, struck out that item and ruled that the writs, as thus amended, were valid. During the course of the argument, it developed that the phrase in the first item of the subpoenas, reading, "accounts relating to the county charges and payments under the plan which was in effect from 1936 to 1938," referred to a plan under which assessments were made by the Democratic State Committee against county committees, "based upon certain percentages of the State pay roll of State employees in that county;" and that the Mr. Graham referred to was an employee of the Democratic State Committee whose expenses were paid by the appellants.

When both sides had been fully heard upon the pending motion, the presiding judge entered the following order: "Let the attachments issue that the witnesses comply, they to remain in the custody of the sheriff until they comply with the subpoena, or with such portion of it as they may not be relieved from upon further application." Before adjourning court he announced he would be in his chambers in the vicinity of the grand jury at 1:30 o'clock.

This colloquy then followed: "The Court: 'Are these gentlemen in court?' Mr. Pannell (counsel for appellants) : 'Yes, both of them are here.'......By the Court: 'All right. Will you gentlemen give me your word that you will be down there at one-thirty with me, or must I turn them over to the sheriff now?' Mr. Pannell: 'I will see to that.' ...... The Court: 'All right. I will give them that opportunity to get these records.' ......"

It is clear from the record that appellants did not stand upon their alleged constitutional rights and persist in their original refusal to produce the records and papers called for by the amended subpoenas. At that point in the proceedings, it became necessary for them to elect between maintaining their stand upon the legal rights they had asserted in justification of their defiance of the command of the court and surrendering themselves into the custody of the sheriff, or retreating from their legal ground by promising obedience to the subpoenas. They chose the latter course and were paroled in the custody of their counsel.

The record further shows that, upon inquiry by their counsel as to the disposition of their petitions to quash the subpoenas, the court entered an order upon each petition reading: "The within petition is refused and an exception to this ruling directed to be noted."

It is important at this stage of the recital of the proceedings to note that the appeals now before us were not taken from the above order issuing attachments for contempt and committing appellants to the custody of the sheriff until they complied with the subpoenas, but were taken from the subsequent orders refusing to quash the subpoenas. If appellants had stood their ground and surrendered themselves to the custody of the sheriff and then appealed from the order committing them for contempt, we would have had an entirely different question in this case.

If the appeals in the present case had been from an adjudication by the court below of contempt, by reason of refusal to comply with a subpoena duces tecum issued in the course of a grand jury proceeding, and a commitment thereunder, (as was the case in *Hale v. Henkel*, 201 U. S. 43, 50 L. Ed. 652, 26 S. Ct. 370; *Consolidated Rendering Co. v. Vermont*, 207 U. S. 541, 52 L. Ed. 327, 28 S. Ct. 178; *Wilson v. United States*, 221 U. S. 361, 55 L. Ed. 771, 31 S. Ct. 538; *Wheeler v. United States*, 226 U. S. 478, 57 L. Ed. 309, 33 S. Ct. 158; *Brown v.*

*United States,* 276 U. S. 134, 72 L. Ed. 500, 48 S. Ct. 288; and *People v. Reynolds,* 182 N. E. 754, 350 Ill. 11), there could be no doubt that such an order would be final and appealable.

After appellants had been paroled, the presiding judge stated that if they brought their papers to his chambers their counsel could be present and there raise any questions relative to the materiality of any of the papers or records so produced.

With respect to the events occurring in chambers, we adopt the following language from appellants' history of the case as printed in their paper book:

"Pursuant to instructions, the said Carl K. Deen and Frank Taylor appeared before the Honorable PAUL N. SCHAEFFER, in his chambers at the time designated, and did thereupon call attention through counsel to the fact that the said papers and records, described in the subpoenas duces tecum,. were included among and not segregated from the voluminous and extensive records of the Democratic State Committee, contained in seven large filing storage boxes.

"Thereupon, the Honorable PAUL N. SCHAEFFER directed the said Carl K. Deen and Frank Taylor, together with Mrs. Rhea Z. Redden, to examine the papers and records of the Democratic State Committee and separate therefrom all correspondence files with the county committees, and particularly the Dauphin County Committee, relative to (1) financial matters and (2) increases in pay, or dismissals of State employees, and continued the said contempt proceedings until the submission of the requested papers and records.

"On the second day of February, 1939, the examination and segregation of such papers and records having been completed, the said Carl K. Deen and Frank Taylor were presented by counsel to the said Honorable PAUL N. SCHAEFFER, and made report accordingly.

"Thereafter, the said Carl K. Deen and Frank Taylor, while the attachment for contempt continued in effect

and had not been dissolved, and under the duress result-ing therefrom, submitted to the Honorable PAUL N. SCHAEFFER, in his chambers at the grand jury head-quarters, of the papers and records described in the sub-poenas duces tecum, the correspondence files of the Democratic State Committee with the county commit-tees, and particularly the Dauphin County Committee, relative to financial matters and increases in pay, or dismissals of State employees, so segregated as afore-said.

"At no time whatsoever has the Honorable PAUL N. SCHAEFFER made any formal order dissolving the said attachments or discharging the said Carl K. Deen and Frank Taylor therefrom, nor has the said Honorable PAUL N. SCHAEFFER ever advised them in any manner that the said attachment for their contempt, issued as aforesaid in open court, is no longer effective. Further-more, the record does not disclose any thing to the contrary."

Seven days after the production and submission of the papers and records, appellants, on February 9, 1939, took the present appeals from the "orders and decrees ......dated the twenty-sixth day of January, 1939, wherein and whereby the said Honorable PAUL N. SCHAEFFER refused to grant the prayer of their respec-tive petitions to quash the subpoenas duces tecum."

It is stated in the Commonwealth's counter history of the case, and not denied in appellants' history, that on the day following the production of the records and papers appellants were called before the grand jury and there testified and identified the papers and records sub-mitted to the presiding judge in his chambers as the papers and records described in the subpoenas. It is true, as asserted by counsel for appellants, that there has as yet been no formal termination of the proceedings had in open court on January 26, 1939, but we think it is also apparent that appellants have, for all practical present purposes, purged themselves of the contempt

of which they were adjudged guilty.

Although the command of the writs had been substantially obeyed, petitions were presented by appellants to this court praying that each appeal should "become and be a supersedeas in regard to all proceedings under and pursuant to the subpoenas duces tecum." We granted rules upon the Commonwealth to show cause why the prayers of the petitions should not be granted, to which rules answers were filed and a hearing had. In addition to filing answers the representatives of the Commonwealth moved to quash each appeal upon the following grounds: (a) The orders refusing to quash the subpoenas were interlocutory and not appealable; (b) the records and papers having been produced and submitted to the grand jury, "any question regarding the sufficiency of the subpoenas is now moot;" and (c) the conduct of the appellants subsequent to the order adjudging them guilty of contempt "amounted to a waiver of any question regarding the sufficiency of the subpoenas."

Under date of February 22, 1939, we entered orders[1] denying the petitions that each appeal operate as a supersedeas, but granting leave to renew the application if, and when, any commitment should be made upon the order of attachment.

We are convinced, upon a review of the entire record, that the controlling issue upon these appeals is whether the orders refusing to quash the subpoenas were inter-

---

[1] "And Now, February 22, 1939, after hearing, the petition for a supersedeas is refused. This order is made on the understanding that the petitioner, against whom an attachment was ordered to issue and who was paroled in the custody of his counsel, pending the segregation of the papers brought into court, was afterwards presented by said counsel to court at the same time the segregated papers were brought into court, and that this action was construed by the court and the district attorney as a compliance with the subpoena and that petitioner is not now in custody. Leave is given to renew this motion if, and when, any commitment should be made upon the order of attachment as aforesaid.

By the Court."

locutory and therefore unappealable. If so, the appeals must be quashed.

In considering this question, it must constantly be kept in mind that Judge SCHAEFFER stated, during the proceedings in open court: "I, as judge, issued those subpoenas, I know of the necessity for them......, I know the connection in which they are desired," and that this statement was made by the judge having full and exclusive control over the grand jury investigation then in progress.

The functions of a grand jury and the nature and scope of its investigatory powers must also be remembered. In the course of his charge to the grand jury, impaneled to make the investigation with which we are now concerned, Judge SCHAEFFER properly said:

"The grand jury is an integral and indispensable part of the criminal courts of Pennsylvania. It is the only body by which a presentment or indictment may be made...... You, having been chosen according to law from the body of the citizens of the county, stand as 'the shield of the innocent against the plottings of private malice, as the defense of the weak against the oppression of political power, and as the guard of the liberties against the encroachments of unfounded accusations from any source.' The oath you have taken requires you to keep secret 'the Commonwealth's counsel, your fellows' and your own,'—which includes the testimony of the witnesses, the manner in which you and your fellows voted upon any presentment or indictment and also the communications between you concerning matters before you.

"You do not try the cases; your action does not involve a trial of the legal or actual truth of the charges made. Your business is not to determine the guilt or innocence of the accused, but merely to pass upon the question of whether or not the evidence is sufficient in your judgment to warrant a trial of the case in this court. You must

determine whether the accusations should be pressed or dropped."

In *Shenker v. Harr, Treasurer et al.,* 332 Pa. 382, 2 A. (2d) 298, our Supreme Court, speaking through Mr. Justice STERN, declared: "A grand jury is not an independent governmental body but is an arm of the criminal court." See also *McNair's Petition,* 324 Pa. 48, 187 A. 498, 106 A. L. R. 1373.

If the contention here advanced in behalf of the appellants be sound, any grand jury investigation, no matter how menacing to the foundations of constitutional government the subject matter of the inquiry might be or when the statute of limitations would bar prosecution and punishment, could be held up, hampered and thwarted, indefinitely through the delays necessarily incident to the taking of an appeal, every time a court refused to quash a subpoena. The law of this Commonwealth and the judiciary branch of its government are not so impotent. The mere statement of the implications of the fundamental contention of appellants furnishes the answer of the law. To adopt their contention would be to supply any group of unwilling witnesses with a weapon which could be effectively used to cripple one of the arms of any criminal court.

It seems perfectly clear to us upon reason and authority that the orders from which these appeals were taken were interlocutory.

*Alexander v. United States,* 201 U. S. 117, 50 L. Ed. 686, 26 S. Ct. 356, is an illustration of the principle that a direction to a witness to obey a subpoena or answer a question is not such a final decision as to be appealable, but if the court, in vindicating its dignity and authority, punishes the recalcitrant witness by actual commitment, the order becomes final and appealable. That case was a proceeding in a circuit court against certain corporations for an alleged violation of the Sherman Anti-Trust Act. Appellants had refused to comply with a subpoena duces tecum on the ground it constituted an unlawful

search etc. The court ordered them to obey the subpoena; from that order they appealed to the Supreme Court of the United States. In quashing the appeals and pointing out that such an order was interlocutory, Mr. Justice McKENNA stated (page 121 ff.): "In a certain sense finality can be asserted of the orders under review, so, in a certain sense, finality can be asserted of any order of a court. And such an order may coerce a witness, leaving him no alternative but to obey or be punished. It may have the effect and the same characteristic of finality as the orders under review, but from such a ruling it will not be contended there is an appeal. *Let the court go further and punish the witness for contempt of its order, then arrives a right of review,* and this is adequate for his protection without unduly impeding the progress of the case." (Italics supplied).

Manifestly the refusal of Judge SCHAEFFER to quash the subpoenas amounted to no more than a direction to obey them.

The case of *Annenberg v. Roberts et al.,* 333 Pa. 203, 2 A. (2d) 612, chiefly relied upon by appellants as entitling them to the present appeals, is clearly distinguishable from the cases now at bar; indeed, the Supreme Court there made express reference to the distinction. In that case a legislative commission, conducting an investigation into the dissemination of gambling and horse racing information in the State, issued subpoenas duces tecum, very broad in scope, which were served upon two of the appellants. The latter filed a bill in equity seeking an injunction against enforcement of the subpoenas. This relief was denied by the court below, but granted by the Supreme Court. Not only were the proceedings civil in character, but the subpoenas were also issued by a nonjudicial body. In the course of its per curiam opinion the Supreme Court stated (pages 215, 216): "A difference is to be noted between an unlawful demand contained in a subpoena duces tecum in *cases pending in court* (as in *American Car & Foundry*

*Co. v. Alexandria Water Co.,* supra, [221 Pa. 529]), and a demand made by a nonjudicial body. In court parties and witnesses may, by appropriate application made in the proceeding, have their rights determined and preserved, but proceedings before a nonjudicial body are in a different class. Parties aggrieved in such proceedings must also have opportunity for judicial hearing if their rights are to be determined and preserved." (Italics supplied).

It may also be noted that in *American Car & Foundry Co. v. Alexandria Water Co.,* 221 Pa. 529, 70 A. 867, the petition of the witness to quash the subpoena was granted by the trial court, and therefore no question concerning the character of an order refusing a petition to quash was involved.

This opinion could be concluded at this point by quashing the appeals because they were taken from interlocutory orders. However, to avoid any possible misunderstanding of the emphasis we have placed upon the fact that these appeals were taken from the orders refusing to quash the subpoenas and not from the order directing attachments for contempt to issue, we deem it advisable to direct attention to another, but incidental, feature of these cases.

Even if appeals had been taken from the order adjudging appellants guilty of contempt and placing them in the custody of the sheriff, we could not have entertained them upon their merits because, as above indicated, the record shows appellants did not stand their ground and surrender themselves to the sheriff, but purged themselves of their contempt by producing the papers and records described in the subpoenas.

After the appellants had produced the papers called for by the subpoenas and had appeared before the grand jury as witnesses in obedience to the command of the writs, there was nothing left for them to appeal from. Every question upon which they now seek an adjudication had become moot before the appeals were taken.

This aspect of the case is ruled by the decision of this court in *Reap's Appeal*, 88 Pa. Superior Ct. 147. There, the sheriff of Lackawanna County was adjudged guilty of contempt for his wilful disobedience of certain orders of the court and sentenced to pay a fine of $500 and to stand committed until the sentence was complied with. Reap paid the fine, thereby purging himself of the contempt, and four days later appealed to this court. It was contended in support of his alleged right to appeal that the payment was made under unlawful duress. The same contention is advanced in the present cases.

In the opinion written for this court by our former President Judge, PORTER, it was pointed out that as the court below clearly had jurisdiction both of the subject matter and of the person of the appellant, the plea of duress was without foundation. This excerpt from the opinion in the case cited is applicable here: "When the court adjudged appellant to be in contempt and imposed a fine, that was a final judgment, from which an appeal would at once lie without an allowance by the appellate court. The appellant was put to his election, he might either appeal, or pay the fine and thus end the whole matter." Citing *Com. ex rel. Wilhelm v. Weigley*, 83 Pa. Superior Ct. 189, Judge PORTER concluded the opinion in the Reap case with the remark, "The appellant having purged himself of the contempt, no question remains for our consideration," and accordingly quashed the appeal. Although we base our decision upon the interlocutory character of the orders actually appealed from, the result, under the circumstances appearing upon this record, would have been the same if the appeals had been taken from the order adjudging appellants guilty of contempt by reason of their original defiance of the subpoenas.

The appeals are severally quashed.