## McNair's Petition.

50

Argued June 26, 1936. Before KEPHART, C. J., SCHAF-
FER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*William B. Secrist,* City Solicitor, and *Anne X. Al-
pern,* First Assistant City Solicitor, for petitioners.

*George F. P. Langfitt,* District Attorney, for respond-
ents.

OPINION BY MR. CHIEF JUSTICE KEPHART, October 5,
1936:

On June 11, 1936, Thomas Sacco appeared before
Judge RALPH H. SMITH, in the Court of Quarter Ses-
sions of Allegheny County, charged with larceny, enter-
ing a building with intent to commit a felony and re-
ceiving stolen goods. Judge SMITH was erroneously in-
formed by a police officer that Sacco's accomplices had
been discharged by the magistrate. Without further
verification of the facts by the magistrate's docket, the
Judge accused Magistrate David Turets of "fixing," and
issued a subpoena for him. The court also ordered that
charges be preferred against those who, apparently, had
been discharged. Magistrate Turets, being questioned
by Judge SMITH as to his disposition of these cases, en-

deavored to explain that three of the defendants had been held for juvenile court, one for criminal court, one had been discharged for insufficient evidence and another had been held over for further hearing. Judge SMITH censured him for not demanding bail from those remanded to juvenile court who had pleaded guilty, for sending them to a court without jurisdiction for trial, and for holding one of the defendants without requiring bail for further hearing. The Judge, however, stated that he had no suspicion or reason to believe the Magistrate was influenced by bribery or other corrupt motive.

Within a few hours thereafter Judge SMITH called before him the grand jury and stated that it had come to his attention "in a very forceful fashion" that "one of the magistrates" had "violated the law." He alleged that the manner in which the violation had occurred was in the discharge of a number of persons accused of felony, where competent evidence had been given by the police of their guilt, which they themselves had admitted, and in not requiring bail from parties who were held for court. The Judge also stated he had information that these practices existed not only with this particular magistrate but with others as well. In fact, the only other statements to the judge concerning previous discharges of men charged with felony were of matters occurring a year before, when three men accused of robbery were released by Magistrate Turets. Other charges, relied upon by Judge SMITH, are so indefinite and vague as not to merit consideration.

He directed the jury to inquire into the following matters: (1) Had the magistrates required bond of persons charged with the commission of felony? (2) Had they admitted to bail persons charged with felony where magistrates are forbidden to accept bail? (3) Had they discharged persons accused of the commission of felony where the parties had admitted their guilt and competent evidence had corroborated the plea of guilty? (4) Had they admitted to bail for further hearing persons

charged with felonies, against whom they had heard sufficient evidence and for whom pleas of guilty had been entered?

The Grand Jury was further instructed to determine what magistrates were guilty of malfeasance or misconduct in office and to report to the court whether they recommended indictments. Subpœnas were directed to issue for witnesses and for the official books and dockets of all the police courts. The records were immediately seized, with the result that confusion followed in administering the law in these courts; persons in jail awaiting trial could not properly be tried, others committed to jail could not be released at the expiration of their sentences, fines could not be collected and transcripts on appeal could not be furnished.

Within a few days the Mayor of Pittsburgh, as chief magistrate, and the four other police magistrates, applied to this Court for a writ of prohibition. The petition charged that the order for an investigation exceeded the powers of the Judge, that there was a paralysis of the administration of criminal justice in the magistrates' courts by reason of the seizure of the records necessary to the conduct of their daily business, and also that the reputations and good character of the members of the minor judiciary were exposed by this investigation to irreparable injury.

After hearing we directed writs of prohibition and mandamus to issue, ordering the judge, the district attorney and the grand jury to cease and refrain from further investigation of the police magistrates, and directing the return of their records, books, dockets and calendars.

The question to be decided by this Court is whether or not, on the facts, the order for a grand jury investigation was within the powers of the court of quarter sessions. Before discussing this question, as the matter concerns the duties of magistrates, it is well to consider their position in the judicial system of our State.

The office of magistrate in this Commonwealth has always been recognized as a judicial office: *Bowman's Case*, 225 Pa. 364; *Freiler v. Schuylkill County*, 46 Pa. Superior Ct. 58; *Carney's Petition*, 3 D. & C. 690. The constitution provides that the judicial power of this State shall be vested in magistrates' courts as well as in the other courts there enumerated (Article V, Sec. 1), and, for the County of Philadelphia, establishes by Article V, Sec. 12, a system of such minor courts. Elsewhere in the constitution, provision is made for the establishment of justices of the peace or aldermen for all other counties (Article V, Sec. 11). In the City of Pittsburgh, in addition to such justices of the peace, by the Act of March 7, 1901, P. L. 20, Article XVI, Sec. 1, as amended by the Act of April 13, 1927, P. L. 200, Sec. 1, there were established police magistrate courts, whose functions are as set forth in the Act of June 16, 1891, P. L. 303.

These courts are of a subordinate nature and limited jurisdiction, but their importance in our system of jurisprudence, as well as the English system in which they had their origin, cannot be ignored. Within the sphere of their powers they have all the attributes of legally constituted courts of justice and are independent of any other tribunal except insofar as their action is reviewable on appeal: *Bowman's Case*, supra. Generally magistrates and justices of the peace exercise both civil and criminal jurisdiction but, in the City of Pittsburgh, the police magistrates' courts have criminal jurisdiction only. Section 1 of the Act of 1891 provides that they shall have "full and complete jurisdiction, power and authority to receive and take criminal informations . . . accusing any person or persons of the commission of any felony or misdemeanor . . . administer oaths or hold preliminary hearings . . . and to commit to jail, bind over for trial . . . or discharge such accused person or persons as the evidence produced at such hearing or hearings may warrant." By Section 3 of the same

Act they are empowered to punish certain minor offenses and, by section 4, have jurisdiction of suits for penalties.

Where a magistrate has no power to finally try and dispose of a case, his duty is to hear the evidence to determine whether the Commonwealth has established a prima facie case. When the magistrate believes that probable cause to hold the defendant has not been proven, he may discharge him; otherwise it is his duty to hold the prisoner for court or grand jury. But it is his discretion, his judgment, which must be exercised, for he is the officer entrusted by the law with the function of rendering a preliminary decision. In its performance he must be free from all external influences and, so long as he renders judgment in good faith, he is accountable to no one. If the Commonwealth deems itself aggrieved by his decision it may bring the matter again before any other officer empowered to hold preliminary hearings: Valentine, Subordinate Courts of Pennsylvania, page 1133; *Com. v. Sharpless,* 31 Pa. Superior Ct. 96; *Com. v. Ramsey,* 42 Pa. Superior Ct. 25. In the conduct of these hearings, magistrates have the power to adjourn and to demand security for appearances at a future date in order that they may fully investigate the matter before them. *Com. v. Ross,* 6 S. & R. 427.

Where the prisoner is held for court the magistrate must admit him to bail (Act of June 16, 1891, P. L. 303, Sec. 2; and see *Com. v. Miller,* 6 Pa. Superior Ct. 35, 40) except in those cases where bail is expressly prohibited by the Constitution or the Act of 1891, namely, manslaughter, arson, rape, mayhem, sodomy, buggery, robbery and burglary. If a magistrate imposes bail it cannot be excessive under the Constitution of this State and the United States. However, as the purpose of bail is to assure the appearance of the defendant (1 Wharton, Criminal Procedure, Sec. 117) if bail is imposed it should be sufficient: *Respublica v. Burns,* 1 Yeates 370. No statute in this State makes it mandatory on

a magistrate to require bail even where the defendant is held for court or the grand jury, although this unquestionably is the universal practice. They may be compelled to require bail where their failure to do so amounts to a gross abuse of discretion: *Com. v. Bartilson*, 85 Pa. 482. Since the circumstances of individual defendants vary, considerable freedom must be allowed the magistrate in the performance of this function. Others may differ from his judgment, but in its exercise he is not subject to criminal liability unless bad faith or corruption be shown. Malfeasance in office cannot be charged except for breach of a positive statutory duty or for the performance of a discretionary act with an improper or corrupt motive: *Com. v. Poet,* 14 Cambria 50; *Wilson v. Com.,* 10 S. & R. 373; 2 Wharton, Criminal Law, Secs. 1894, 1897. That a magistrate required no bail of defendants held for court, as in this case, without more, constitutes no offense nor violation of his duties of office, though it is a practice not to be recommended or encouraged.

Neither courts of common pleas nor quarter sessions can directly supervise magistrates in the exercise of their powers. Of course, like other public officers, they are amenable to mandamus proceedings to compel them to perform their duties: Act of May 13, 1925, P. L. 664, Sec. 1. In certain instances their decisions are reviewable on appeal, but otherwise they must be left free to exercise an independent judgment in the conduct of their office. They cannot be subjected to liability, civil or criminal, for any of their judicial acts, no matter how erroneous, so long as they act in good faith. The reasons are fully set forth in *Com. v. Cauffiel,* 79 Pa. Superior Ct. 596, where a full citation of authority will be found. It was there stated: "If a judge of an inferior jurisdiction has the power under authority of law to hear and pass on cases, to which the particular offense belongs, the same reason requires that he should be protected from liability for erroneous action, which exempts

56

judges of superior or general jurisdiction from such liability. If judges properly expected to be most learned in the law can plead official exemption for their blunderings in the law, a fortiori those from whom less is to be expected should not be compelled to respond in damages for their mistakes honestly made." See also *Com. v. Yerkes*, 86 Pa. Superior Ct. 5, and *Hanna v. Slevin*, 8 Pa. Superior Ct. 509. Superior tribunals cannot arrogate the power to publicly reprimand or censure these subordinate judicial officers with whose judgment or discretion they may differ. Nor do they have the power of direct regulation or control over them. Thus in *Bowman's Case*, supra, where the Act of 1907, authorizing the Courts of Common Pleas to remove justices of the peace for cause, was declared unconstitutional, the court stated "Under all our constitutions a justice of the peace has been a constitutional officer, and by the eleventh section of the judiciary article of the present one, he is a judicial officer. The appellant was as much a judge, though in a limited sphere, as the judicial officer by whose decree the appellees would have him removed from office."

Bearing this in mind, we come then to a consideration of the purposes for which a judge of the court of quarter sessions may order a grand jury investigation and what facts must exist and be known to support the order.[1]

---

[1] The history of the inquisitorial powers of the grand jury is lost in the obscurity surrounding the origin of that body. Legal writers and historians disagree as to the time at which the grand jury first appears as an English institution. Some attribute its introduction to the Saxon Kings, particularly to Ethelred in the 10th century, and others to William the Conqueror, or his followers, in the 11th century. The English grand jury, whether of Norman or Saxon origin, appears at its inception to have been purely an accusatorial body without power to conduct wide investigations of the conduct of officials. According to Bracton, who wrote in the time of Henry II, each hundred, which was a subdivision of local government, selected twelve knights or freemen, who were to appear before the itinerant judges in eyre appointed by the king to

The ordinary conception of the duties of a grand jury was to guard the rights and liberties of the people; it was so understood at its inception. Because of the method by which its deliberations are conducted and the secrecy surrounding them, it is a particularly suitable body to investigate misconduct of public officials and public evils. These inquisitorial powers were recognized as early as 1791 in this Commonwealth: Addison's Reports (Pa. 1791), App. 71. In some states the power of

---

administer his laws. This meeting of the grand jury was held secretly. The judges presented to the jurors a list of crimes and offenses against the crown, taking each offense separately, and asking whether or not the jurors knew of any man in their own hundred who had committed this offense. The jurors replied upon the basis of their personal knowledge. It was within the discretion of the judges to determine whether or not the accusations by the jury were well founded and to interrogate the jurors as to the extent of their knowledge.

Probably in the reign of Edward III the county grand jury or county inquest was inagurated. This grand jury did not immediately replace the jury for the hundreds, but co-existed with it. It likewise consisted of twelve knights or freeholders, and its jurisdiction was limited to the county rather than to the hundred. This inquest, because of its wider scope, gradually supplanted the hundred inquest and is probably the direct antecedent of our own grand jury. It was likewise limited to the making of accusations in answer to the questions propounded by the itinerant judges but it seems also to have sat as a petit or traverse jury to try the offenders against whom it made presentments.

The broader power of the grand jury to investigate the conduct of public officials and to inquire into public evils, is apparently of later development but is now well settled. See Comments, 2 Hale's Pleas of the Crown, (1st Am. Ed.) 164; I Holdsworth, A History of English Law, 321; Re Charge, 2 Sawyer 667, Fed. Case No. 18, 225; Commonwealth v. Kenehan, 12 D. & C. 585. The early English authorities, including Blackstone, make no direct reference to the conduct of general investigations, but speak merely of its position in criminal jursprudence as a body empowered to prefer indictments or accusations against specific offenders; See 4 Blackstone, Com. 302; Bracton, De Corona, cap. 1; Hale, loc. cit., supra. This was its primary function and consistent with the purpose for which it was created, namely, to protect citizens from unjust and summary accusations.

investigation is virtually unlimited, and the grand jury, of its own motion, may originate and conduct them: 2 Wharton, Criminal Procedure (10th ed.), Sec. 1263, and see *Blair v. United States,* 250 U. S. 273. But in Pennsylvania the freedom of the grand jury is very much restricted: *Blair v. United States,* supra; Dession & Cohen, The Inquisitional Functions of Grand Juries, 41 Yale L. J. 687. Our courts, mindful of the danger that this body might, if unrestrained and unguided, encroach upon the very liberties which it was created to protect, have imposed definite limitations upon its investigatorial powers. An investigation by a grand jury directed by the court, involves all the powers and incidents necessary to a complete inquiry into the subject matter in charge. The jury may, through the court, subpœna books, papers, witnesses, and subject them to examination. Its powers are vastly broader than a committing magistrate's. Its concern being of things rather than individuals, the scope of its investigation is very wide, including all the ramifications of the subject investigated and extending to all who may be brought within the field of culpability. Thus with a definite person to begin with it may spread as a fan and include many others. Therefore, it has been considered all important by this court that a grand jury should have no power to initiate an investigation. *Lloyd & Carpenter's Case,* 3 Clark 188; *In re Alleged Extortion Cases,* 29 Pa. C. C. 538. It may do so only when charged by the court and then under prescribed limitations: *The Grand Jury as an Investigating Body of Public Officials,* 10 St. John's Law Rev. 219, 221. The power can be exercised only upon proper occasion. The grand jury is an arm of the criminal court and criminal acts alone must be the foundation of its deliberations. When a court orders an investigation it acts under its official responsibility and must answer for the step taken when it is not justified in the exercise of sound judicial discretion but is the result of an arbitrary capricious exercise of power.

*Lloyd & Carpenter's Case,* supra. Unless specifically authorized by the legislature, the grand jury has no power to hear any matter that does not lead to criminal prosecution: *Alt v. State,* 83 Tex. Cr. 337. It cannot question a witness on any subject not associated with actual crime: *Ex parte Jennings,* 240 S. W. 942.

The leading Pennsylvania case on the functions of a grand jury is *Lloyd & Carpenter's Case,* supra, cited frequently with approval by this court. There the grand jury presented a written communication to the court stating that one of its members had charged before them that the State Treasurer and another official had converted state money to their own use and that others, unknown, had been accessories thereto. They requested the court to order an investigation by the grand jury through compulsory process for witnesses, but made no formal presentment. The court, in denying the request, called attention to the Bill of Rights, which provides that the people shall be secure in their persons, houses and property from unreasonable search and seizure; that the accused has a right to be heard by himself and counsel and to meet his accusers and witnesses face to face (to which may be added that he has a right to know who his prosecutor might be and to have some one on whom responsibility might be fixed for the action if it is unlawful). Reference was made to the efficacy of the ordinary proceeding by information and hearing whereby the defendant may know the evidence to support the charge against him and the time, place and circumstances of the alleged crime, and have the right to cross-examine the prosecution's witnesses. *All these benefits are denied the accused by a grand jury's investigation.*

Judge KING then pointed out that there are certain extraordinary modes of procedure. The prosecuting officer, by leave of court, may prefer an indictment without a previous binding over or commitment of the accused. This is what is commonly called a district attorney's bill: *Commonwealth v. Montross,* 8 Pa. Superior

Ct. 237; *Commonwealth v. Brown*, 23 Pa. Superior Ct. 470; *Commonwealth v. Beldham*, 15 Pa. Superior Ct. 33; *Rowand v. Commonwealth*, 82 Pa. 405. A grand jury may make a presentment of its own which must originate from the personal knowledge of the grand jurors. It cannot come from knowledge or information gained from third persons. See *Commonwealth v. Green*, 126 Pa. 531; *Commonwealth v. Zortman*, 16 Dist. 969; *In re Alleged Extortion Cases*, supra; *Commonwealth v. McComb*, 157 Pa. 611.

The last of the extraordinary procedures, pointed out by Judge KING, is where criminal courts direct an investigation of matters of "general public import, which, from their nature and operation in the entire community, justify such intervention. The action of the courts on such occasions rather bear on things than persons; the object being the suppression of *general* and *public* evils, affecting in their influence and operation *communities rather than individuals and . . . the subject of general than special complaint.* Such as great riots . . . general public nuisances . . . multiplied and flagrant vices tending to debauch and corrupt the public morals, and the like."

Judge PAXSON *In The Matter of the Memorial of the Citizens' Association*, 8 Phila. 478, where the court had been memorialized to call a grand jury to investigate the violation by traction companies of the state law and city ordinances, refused to make the order, saying: ". . . this power, which is a most delicate one, is never exercised unless under urgent necessity or . . . [where] the public would suffer from the delays incident to ordinary forms of law." See also *Com. v. Hurd*, 177 Pa. 481; *Com. v. Hackney*, 117 Pa. Superior Ct. 519; *Com. v. Sunderlin*, 31 Pa. Superior Ct. 349, 351; *Com. v. Dietrich*, 7 Pa. Superior Ct. 515; *Com. v. Klein*, 40 Pa. Superior Ct. 352.

A grand jury investigation, because of the gravity of the undertaking, must have a definite purpose to dis-

cover criminal acts which seriously affect or injure the public generally, which effect, if permitted to continue, would endanger public safety *(Lloyd & Carpenter's Case,* supra; *Commonwealth v. Crans,* 2 Clark 192), or health, demoralize the personal security of members of the public, or permit systematic criminal depredations by public officers: *Commonwealth v. Bolger,* 229 Pa. 597; *Commonwealth v. Klein,* supra; *Commonwealth v. Hurd,* supra; *Commonwealth v. Dietrich,* supra; *Commonwealth v. Sunderlin,* supra. Such matters require immediate attention so that these evils may be suppressed. The criminal acts subject to investigation must be such that the ordinary process of the law is inadequate to cope with or discover them: *Memorial of the Citizens' Association,* supra.

A grand jury's investigation cannot be a blanket inquiry to bring to light supposed grievances or wrongs for the purpose of criticizing an officer or a department of government, nor may it be instituted without direct knowledge or knowledge gained from trustworthy information[2] that criminal conspiracy, systematic violations of the law or other criminal acts of a widespread nature prevail, and at least one or more cognate offenses should exist on which to base a general investigation. The investigation cannot be aimed at individuals primarily, as such, nor at the commission of ordinary crimes *(Commonwealth v. Zortman,* supra; *Commonwealth v. Reedy,* 21 D. & C. 524; *In re Alleged Extortion Cases,* supra), but should be of matters of criminal nature wherein public officers or the interests of the general public are involved.

Where it is made to appear to a court, as above indicated, that there exists a system of crime among public officers, or criminal conspiracies respecting public busi-

---

[2] In all cases in this State where investigations have been ordered or refused, written formal charges have been made with a definite crime in evidence. All concerned the criminal misconduct of public officers.

ness, safety or health, or other criminal acts affecting these functions of a widespread nature, jeopardizing or demoralizing public security or health, the judge may properly order such investigation.

Investigations for purely speculative purposes are odious and oppressive and should not be tolerated by law. Before they may be instituted, there must be knowledge or information that a crime has been committed. There is no power to institute or prosecute an inquiry on chance or speculation that some crime may be discovered: *Re Morse*, 87 N. Y. Supp. 721. The grand jury must know what crimes it is to investigate. The court of quarter sessions has no power to set such an inquiry in motion unless it has reasonable cause to believe that an investigation will disclose some criminal misconduct which is within its jurisdiction to punish.

The grand jury must not be set upon fruitless searches, founded upon mere rumor, suspicion or conjecture. These are proper matters for police investigation. Before reflection is cast upon the integrity of public officials a preliminary investigation by the forces of law charged with the discovery of crime should be made to determine whether there is any real foundation. Such jury investigations involve great expense to the public; subject the citizen to inconvenience and frequently interfere with the normal functioning of public officials and bodies brought before it. They throw a cloud of suspicion upon the parties subject to attack and undermine public confidence in them. There must be a sound, solid basis on which to proceed.

There are no facts in this case which warrant a general investigation into the conduct of the magisterial system in the City of Pittsburgh. If Magistrate Turets had admitted the commission of an offense the regular process of the law was ample to deal with it. The Judge, if he felt that a criminal act had taken place, should have turned the case over to the district attorney for action. As it was admitted there was no bad faith and the mis-

take was an error of judgment, neither the district attorney nor the grand jury under such conditions could impose criminal liability. We have discussed the matter of bail and need not further dwell on it. The most important consideration was the propriety of the disposition of these cases by the magistrate, and that involved the exercise of judicial discretion as to the proper course to be pursued. Unless there was criminal bad faith it was not the function of Judge SMITH, a judge of the quarter sessions, to supervise or criticize that disposition, nor was it the province of the grand jury to embark upon an investigation criminal in nature merely because they or the Judge may have differed from the magistrate's judgment. The use of the grand jury as an inquisitorial body is to be limited to the investigation of criminal conduct and is not to be extended to the review of judicial discretion.

The action of the magistrate in committing some defendants to the juvenile court may have been the result of an erroneous conception of the law, but does not constitute criminal misconduct. The other charges of release of criminals are so vague and indefinite that no investigation on such information could be ordered, but, even if complete information were available, it should appear that fraud, dishonesty, or corruption motivated the magistrate in discharging the persons released; in other words, bad faith must appear. As these are admittedly the gravamen of the alleged offenses which caused the court to start the investigation, it is apparent that the court erred in so doing.

That this investigation was founded on an illusory and unsound basis is confirmed by the admission of counsel representing the respondents who, during the hearing before this Court, admitted that he expected to uncover no evidence of corruption and characterized the investigation as a "fishing" expedition. Such an inquiry is not within the scope of a grand jury's powers. General investigation of governmental agencies, instituted

indiscriminately without sufficient reason to believe that the commission of indictable offenses or corruption in office will be brought to light are unlawful.

It is argued that this Court is without jurisdiction to award a writ of prohibition. In *First Congressional District Election,* 295 Pa. 1, 13, it was pointed out that this Court possesses all the processes anciently possessed by the court of King's Bench, unless limited by statute. Our power to issue a writ of prohibition has never been doubted. Such a writ is proper not only wherever a court acts outside of its jurisdiction but also when there is an abuse of jurisdiction. As stated in High, Extraordinary Legal Remedies (2d ed.) 604, "The object of the writ being to restrain subordinate judicial tribunals of every kind from exceeding their jurisdiction, its use in all proper cases should be upheld and encouraged, since it is of vital importance to the due administration of justice, that every tribunal vested with judicial functions should be confined strictly to the exercise of those powers with which it has been by law entrusted." As previously pointed out the circumstances which prompted the present investigation were such as to render it totally unauthorized and an abuse of discretion upon the part of the court below. It has resulted in the disruption of the police magisterial system, the seizure of records and other matters. The parties investigated are subjected to unjustified public suspicion. No other legal procedure than through the grant of a writ of prohibition is open to halt these apparently fruitless and pointless investigations, entailing great expense to the Commonwealth and inconvenience to the public at large. The authority of the district attorney and the grand jury to further pursue their investigations falls with that of the court which directed it in the first instance.

For the reasons above stated we directed the writs of prohibition and writ of mandamus to issue at the time this case was heard.