396 A.2d 1311

**COMMONWEALTH of Pennsylvania**

v.

**Jack BESTWICK, Appellant.**

Superior Court of Pennsylvania.

Argued April 12, 1978.
Decided Dec. 29, 1978.

Timothy L. McNickle, Grove City, for appellant.

David B. Douds, Assistant District Attorney, Hermitage, for Com., appellee.

Before JACOBS, President Judge, and HOFFMAN, CERCONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

PER CURIAM:

The six Judges who decided this appeal being equally divided the judgment of sentence is affirmed.

PRICE, J., files an opinion in support of affirmance in which JACOBS, P. J., joins.

SPAETH, J., files an opinion in support of affirmance.

HESTER, J., files an opinion in support of reversal in which CERCONE and VAN der VOORT, JJ., join.

HOFFMAN, J., did not participate in the consideration or decision of this case.

PRICE, Judge, in support of affirmance:

This appeal arises from denial in the court below of appellant's motions in arrest of judgment and for a new trial. Appellant, an assistant superintendent at the District 1–4 office of the Pennsylvania Department of Transportation (PennDOT), was convicted of violating Pennsylvania's "anti-macing act."[1] Appellant raises five alleged errors on

1. The Act of April 6, 1939, P.L. 16, § 1 (25 P.S. § 2374) provides:

"It shall be unlawful for any political committee or any member, employe or agent thereof, or for any public officer or employe, or any

appeal for our consideration. For the reasons stated herein, we would affirm the judgment of sentence.

Appellant first asserts that the lower court erred in failing to grant his motion to dismiss the presentments of the investigating grand jury, out of which his conviction culminated, and in failing to quash the indictments on the basis that the petition requesting the grand jury was not self-sustaining and did not contain the required factual specificity. In order to answer this assertion, it is first incumbent upon us to review the district attorney's petition in detail.

On June 2, 1975, the district attorney of Mercer County filed his petition, which stated that his office had been "conducting an investigation into allegations of the macing of employees of the Pennsylvania Department of Transportation in Mercer County for political donations." The petition asserted that PennDOT supervisory personnel had extorted funds from persons seeking contracts with PennDOT, see 18 Pa.C.S. § 3923, and that contract awardees were thereafter required to return a percentage of their earnings to PennDOT personnel. With the aid of PennDOT supervisory personnel, other individuals were alleged to have formed a paper corporation and to have received payments for work never performed. See 18 Pa.C.S. § 3922. The petition asserted that investigation had already disclosed that these were not single, unrelated incidents, but were

other person whatsoever, directly or indirectly, to demand from any public officer, subordinate or employe holding any office or position of honor, trust or profit under this Commonwealth, or otherwise engaged or employed in the service of the Commonwealth, or employed by, or in any way engaged in the service of, any political subdivision, or from any person receiving any public assistance whatsoever from the Commonwealth or the United States, directly or through employment on public works, or any person, association or corporation desiring or having a contract with, or a certificate, license, or permit from the Commonwealth or any political subdivision, any assessment or percentage of any money or profits, or their equivalent in any thing of value, with the understanding, express or implied, that the same may be used or shall be used for political purposes: Provided, however, That nothing in this act contained shall be construed to prohibit voluntary contributions to any political committee or organization for legitimate political and campaign purposes to the extent such contributions are not prohibited by law."

part of a "widespread and systematic scheme by which a large number of persons ha[d] conspired to obtain money and property for themselves and/or the Democratic Party." *See* 18 Pa.C.S. § 903.

The petition further asserted that the alleged criminal activity affected the community; that the proper administration of the government was hampered; that public employees were demoralized by the actions alleged; and that the effectiveness of government operation was undermined. The petition pointed out that the allegations indicated "systematic depredations by public officers," and that the public as a whole, rather than single individuals, was victimized; public confidence in governmental integrity was endangered. The petitioner contended that normal processes of law could not accommodate the investigation, and that the grand jury's subpoena power appeared essential, since documentary evidence was held and controlled by those who committed the offenses, certain persons involved refused to cooperate with the state police, and, due to fear of reprisal, witnesses were generally reluctant to assist in the investigation.

The petition stated that the material contained therein was derived from statements given to state police investigators, to the "Gleason Committee,"[2] and to investigators of other legislative and executive departments. The petition concluded:

"Your Petitioner believes that after a grand jury investigation there will be enough evidence to obtain at least one indictment on each of the above named specific offenses. In order to protect the rights of .those persons involved in the above named offenses, your petitioner has refrained from inserting names in this petition. Your Petitioner is prepared, however, to present documentary evidence to the Court, if the Court so desires, in support of

2. A Special Legislative Investigating Committee, called the "Gleason Committee," conducted hearings in 1974 to study PennDOT contracting policies.

the above charged offenses. Said documents and evidence would include the names of the alleged actors and victims, as well as the facts and circumstances surrounding the commission of the offenses."

On June 3, 1975, the Honorable John Q. Stranahan conducted an *in camera* hearing to determine the propriety of convening the investigative grand jury and to garner specific information in support of the petition. Assistant District Attorney John Garhart stated that the activity to be investigated spanned a three-year period. Cash payments were made by a number of private contractors to PennDOT personnel, and signed statements of those contractors were read into the record. Mr. Garhart stated that the funds were not believed to be going into Mercer County Democratic Committee coffers, because its books did not reflect such contributions. It was therefore believed that the money was being kept by individuals or was being forwarded to the state committee. Several of the contractors made statements that their money was taken by a conduit to appellant, or that named PennDOT supervisory personnel approached them to reveal what appellant was currently demanding. One individual stated that he was informed that unless he paid the requested amount, at appellant's direction, his equipment would be the last to be used by PennDOT for service. Another contractor was approached by appellant for a contribution, and decided to make the payment because he felt he would lose work otherwise.

In many of the statements presented to the court, appellant's name appeared. Several other names were mentioned repeatedly. One contractor was told that the money was destined for Harrisburg. Several contractors believed that PennDOT personnel who approached them were being pressured from higher up in the party system.

On the basis of the petition and *in camera* proceeding, the grand jury was convened. The court order stated in part:

"The grand jury investigation is necessary to discover what may be criminal acts which seriously affect and injure the public and to obtain evidence leading to the

indictment and prosecution of persons who have committed specific crimes within the statutory period and within the jurisdiction of the court. Such crimes may include: the illegal solicitation of political contributions from persons and corporations desiring to have contracts within the Commonwealth and by private persons through collaboration with government employees, to obtain by theft and deception public monies, and similar or related crimes involving official corruption."

As justification for granting the Commonwealth's petition, the opinion of the court below, authored in compliance with Pa.R.A.P. 1925(a), states:

"Following the hearing, the Court issued an order granting the petition of the District Attorney. The Court authorized and approved the investigation only after concluding that widespread corruption and systematic violations of the penal laws of the Commonwealth prevailed in Mercer County, District 1–4, Office of PennDOT, all of which demoralized the community, created disrespect for laws, undermined public confidence in government, and jeopardized public safety. Finding that the ordinary processes of law were inadequate to cope with the situation, the Court determined that the convening of a special investigating grand jury was justified."

Following its investigation, the grand jury returned presentments recommending that appellant be indicted for bribery, macing, extortion, and conspiracy. Prior to submission of these presentments to the indicting grand jury, appellant filed petitions to dismiss the presentments and to grant a preliminary hearing, at the time making his first assertion that the investigating grand jury was improperly convened. Those motions denied, appellant was indicted and subsequently filed his motion to quash. Finally, post-trial, appellant again asserted his argument that the grand jury was improperly empanelled.

The investigating grand jury is an unusual mode of instituting criminal proceedings. In the majority of criminal cases, an action commences with a complaint filed by the

appropriate prosecuting official. Preliminary arraignment and a preliminary hearing are then conducted. This procedure, however, has not been without exception in Pennsylvania. *See Commonwealth v. McCloskey*, 443 Pa. 117, 277 A.2d 764 (1971). As early as the comprehensive opinion in *Lloyd and Carpenter's Case*, 5 Pa.L.J. 55, 3 Clark 188 (Ct. of Qtr. Sess. of Phila.1845), Judge King noted that, when dealing with investigating grand juries, strict safeguards are necessary because, except in an exceptional case, a defendant should not be deprived of having a preliminary hearing and a known accuser. Because of its uniqueness, Pennsylvania appellate courts have stated that "this power, which is a most delicate one, is never exercised unless under urgent necessity or . . . [where] the public would suffer from the delays incident to ordinary forms of law." *McNair's Petition*, 324 Pa. 48, 60, 187 A. 498, 504 (1936). The *McNair* court expanded on this proposition:

"A grand jury investigation, because of the gravity of the undertaking, must have a definite purpose to discover criminal acts which seriously affect or injure the public generally, which effect, if permitted to continue, would endanger public safety [citations omitted] or health, demoralize the personal security of members of the public, or permit systematic criminal depredations by public officers [citations omitted]. Such matters require immediate attention so that these evils may be suppressed. The criminal acts subject to investigation must be such that the ordinary process of the law is inadequate to cope with or discover them [citation omitted]." *McNair's Petition, supra*, 324 Pa. at 60-61, 187 A. at 504.

In *Dauphin County Grand Jury Investigation Proceedings (No. 1)*, 332 Pa. 289, 2 A.2d 783 (1938), the supreme court emphasized that a trial court must have definite information that criminal acts have been committed and at least one or more offenses exist upon which to ground a general investigation. The supreme court granted the district attorney leave to amend or supplement his originally filed petition. The first petition was flawed because it did not contain

allegations of when or where the criminal acts occurred, thus rendering it impossible for the court below to determine whether the statute of limitations or the court's jurisdiction presented any roadblocks to the investigation. The court further recognized that the petition need not set forth in detail the evidence upon which the Commonwealth relies, but must, at a minimum, delineate the specifics of one crime charged as part of the system of related criminal activity.

■■■ Appellant argues that the petition in this case contained none of the required specifics, and states further that a petition must be self-sustaining, citing *Grand Jury Investigation of Western State Penitentiary,* 173 Pa.Super. 197, 96 A.2d 189 (1953).[3] Admittedly, the petition in this case is devoid of specifics. However, the district attorney explained in the petition his failure to present details therein, and asserted his ability to provide them at the court's request. Our research unveils no case law or rule of court which prohibits the court from utilizing an *in camera* hearing to supplement a petition for the convening an investigating grand jury. And further, we are satisfied that the petition and record of the hearing, when read together, were clearly adequate, under legal precedent, to authorize the lower court's order.[4]

■■■ While it is true that a grand jury investigation cannot be used simply to review the quality of administration in government agencies, *Grand Jury Investigation of*

**3.** Appellant cites Grand Jury Investigation of Conditions at Western State Penitentiary, 173 Pa.Super. 197, 96 A.2d 189 (1953), for the proposition that the petition must be self sustaining. While the court did use that language in the *Western Penitentiary* case, no statutory or judicial authority was cited therefore. Further, in *Western Penitentiary* the lower court had not conducted a hearing, as was done in the instant case. The hearing in this case, when permitted to supplement the petition's contents, produced clearly adequate information to justify empanelling of the grand jury.

**4.** Appellant argues that the transcript of the *in camera* hearing should have been made available to him before trial, but was not in fact made public until almost one year after his conviction. Thorough study of the record indicates that appellant did not request the transcript in the court below, and therefore, cannot now complain.

*Western State Penitentiary, supra,* or to look into negligent or poor administration of government agencies, *Philadelphia County Grand Jury Investigation Case,* 347 Pa. 316, 32 A.2d 199 (1943), it clearly can be utilized to investigate alleged illegalities in a state agency or local governmental unit. *Dauphin County Grand Jury Investigation Proceedings (No. 1), supra.*

■■ Without question, the criteria enumerated in *Lloyd and Carpenter's Case, supra,* have been satisfied in the instant case. Specifically, the integrity of a state governmental agency and all those dealing with it is of vital concern to the community. Although individuals have been victimized, the taxpayer and citizens are even more jeopardized when situations such as the one with which we are here concerned are permitted to flourish. In *Dauphin County Grand Jury Investigation Proceedings (No. 1), supra,* it was stated that "conditions should be such as to make it reasonably impossible to obtain evidence without the aid of the grand jury." *Id.* 332 Pa. at 307, 2 A.2d at 792. The district attorney stated at the hearing that the subpoena power of the grand jury was greatly needed in this case, since so many contractors who were approached feared reprisal and accordingly hesitated to cooperate. The scope of the investigation was sufficiently circumscribed by the information presented at the hearing. The lower court judge delineated the scope in his order as

"the illegal solicitation of political contributions from persons and corporations desiring to have contracts within the Commonwealth and by private persons through collaboration with government employees, to obtain by theft and deception public monies, and similar or related crimes involving official corruption."

Further, it was clear from the statements read that the alleged crimes occurred within Mercer County, and, that the statute of limitations had not run on the offenses. Appellant was ultimately convicted for acts occurring in the winter of 1972–73, and was indicted on September 5, 1975, well within the six year period of limitations. *See* the Act

of March 31, 1860, P.L. 427, § 77 (19 P.S. § 211),[5] *as amended.* Finally, we are satisfied that the district attorney adequately established that the specific crimes alleged were part of a system of illegalities and instances of official vice and corruption. *Commonwealth ex rel. Camelot Detective*

5. 18 Pa.C.S. § 108(c)(2), effective June 6, 1973, has changed the law so that the normal two-year statute of limitations may not be extended for more than an additional three years in the case of a public officer or employe committing an offense in the course of, or in connection with, his office.

Appellant raises an additional assertion in this appeal which touches on the statute of limitations, claiming that "the occupancy of the public office must be an essential element of the crime in order to extend the statute of limitations beyond 2 years [under 19 P.S. § 211]." Appellant argues that the court below therefore erred in failing to grant his motion to quash the indictment because it was brought beyond the two-year statute. We find no such limitation in 19 P.S. § 211, which provides in part:

"[I]ndictments for malfeasance, misfeasance, or nonfeasance in office, or for extortion or blackmail by color of office, or for embezzlement of public moneys or property or fraudulent conversion of public moneys or property, or for any misdemeanor in office, or for any conspiracy to commit any of said offenses heretofore or hereafter committed by any officer or employe of this Commonwealth or any agency thereof . . . may be brought or exhibited at any time within two years from the time said public officer or said employe shall have ceased to occupy such office or such employment, but in no event more than six years from the commission of the offense."

Certainly macing is an example of malfeasance in government service, and is therefore covered by the extended statute of limitations.

Appellant attempts to analogize the extended statute of limitations applicable to public officers or employes with the statute applicable to corporate officers and those in positions of corporate trust. 19 P.S. § 213, which deals with corporate personnel, specifically provides, however, that the extended statute "shall not be construed so as to apply to indictments for any felony or misdemeanor other than those as to which any of the foregoing relationships to a bank, body corporate or public company, or municipal or quasi-municipal corporation, is an essential element of the crime." As already indicated, 19 P.S. § 211 contains no similar limitation; appellant's efforts at comparison are without merit.

In sum, it is irrelevant, for purposes of the statute of limitations, that non-governmental agents and employes may be convicted of macing. Therefore, although appellant's indictment on September 5, 1975, may have been beyond the normal two-year statute of limitations from the date of the criminal acts occurring at unspecified times in the winter of 1972–73, it was clearly within six years of those acts. The motion to quash, based upon the statute of limitations, was properly denied.

*Agency, Inc. v. Specter,* 451 Pa. 370, 303 A.2d 203 (1973), rather than isolated, unrelated incidents, and thus, were ideally addressed by an investigating grand jury.

Appellant next argues that the court below erred in permitting one witness, Peter Hoobler, to testify to the "gist" of a conversation that he had with appellant in the fall or winter of 1972–73. During 1969–70, Mr. Hoobler began leasing a truck to PennDOT for snow removal. In 1972, he was approached by someone other than appellant to contribute to the Democratic Party from five to ten percent of the income from an earlier contract with PennDOT. When his truck was not called out much in 1972 for snow removal, Mr. Hoobler went to speak with the superintendent of District 1–4. Finally, Mr. Hoobler went to appellant, and after this meeting, he contributed $100.00 in cash to a conduit to be delivered to appellant.

The following was part of Mr. Hoobler's testimony on direct examination:

"Q. Do you remember what you said to him [Appellant Bestwick], if anything?

A. I believe it was along the same words that I said to Mr. Harpst.

Q. What was the gist, or what do you recollect of your conversation with Mr. Bestwick?

A. I just talked in common words, and I said, hey, my truck needs some work. I got to work it someplace this winter.

Q. Did Mr. Bestwick make any reply to you?

A. Yes, there was a reply.

Q. What was the reply, if you recall?

A. I'm not sure of the exact words that were used except the phrase came up that, it's either, you know how it is, or that's how it is.

Q. Do you remember anything else about the conversation, or anything else that was said?

A. I don't remember the exact words said, no.

Q. Do you remember the gist of the conversation?

A. This was about snow removal for the truck. And from the conversation, I knew that if I was going to have work this truck—

[Defense Counsel]: Now I object—

The Court: *There is a distinction, Mr. Hoobler, between testifying as to what the gist of the conversation was and what you interpreted it to mean. Could you just state, not the exact words because, you say, you don't recall them, but what in substance was said by Mr. Bestwick and by you?*

A. I was talking strictly about the truck for snow removal and I knew from previous conversations with previous individuals—

. . . . .

[Defense Counsel]: Object.

[Defense Counsel]: It's obvious he's going to state hearsay. He's talking about—

The Court: Well, he hasn't said what he knew—

[Defense Counsel]: Well, I understand that—

The Court: . . . he's talking about previous contact with other individuals.

[Defense Counsel]: I'm sorry, it's too late after he's said it, unless he is going to talk about one of these two defendants here, it's going to be hearsay.

The Court: Well, I don't know what his answer is going to be. The fact that he has said he had previous information from other individuals isn't objectionable as long as he doesn't testify what the information is. All right now, we're not interested in what information you got from other individuals. What we're interested in is, what conversation you had with Mr. Bestwick, the gist of it, to the best of your recollection.

A. *The gist of the conversation was, if I paid some money my truck would work.*

[Defense Counsel]: Now I object and move to strike. I believe what he said was, the gist of the conversa-

tion was that, and that could be a conclusion that he drew or an inference that he drew.

The Court: All right, well, let's clear that up. *Did Mr. Bestwick tell you that if you paid some money your truck would work?*

A. *I don't know if that's the exact words he used but this is where this phrase came out, that's how it is.*

Q. Do you recall any other part of the conversation?

A. No." (N.T. 140–43) (emphasis added)

■ Appellant argues that Mr. Hoobler was thus permitted to testify to his own conclusions and inferences, and that he thereby usurped the province of the jury. Although it is true that this court has said in a similar situation that a witness should not be permitted to testify to his impression or understanding of a defendant's conversation with him, *Commonwealth v. Zeger,* 200 Pa.Super. 92, 186 A.2d 922 (1962), we cannot conclude that the court below erred in this case.

First, it is clear from the exchange to which appellant objects that Mr. Hoobler at no time represented that he could quote appellant's conversations precisely. He was cautioned by the judge to testify to the "gist" or substance of the conversation, but not to give a conclusion. When asked by the court if appellant had told him that if he paid money his truck would work, Mr. Hoobler testified, "I don't know if that's the exact words he used but this is where this phrase came out, that's how it is." (N.T. 143) Further on in his testimony, Mr. Hoobler said he put $100 in an envelope for delivery to appellant and that when the next snow fell, his truck was called out by PennDOT.

■ Second, we conclude that the admission of Mr. Hoobler's testimony indeed, was, at most, harmless error. On cross-examination, appellant was asked if he made any subsequent contributions.

"Q. Your second contribution, you said, was around the same, about 100 or $150?

A. Yes.

Q. Was it made later in the same winter?

A. In the same season.

Q. The same season?

A. Yes . . . yes.

Q. *There was never any request for that contribution, was there?*

A. *Yes, I had been asked if I was going to give a little more.*

Q. *By whom?*

A. *Mr. Bestwick."* (N.T. 152) (emphasis added)

 Appellant's next contention is that the verdict was against the weight of the evidence. In fact, appellant's argument appears to be that Mr. Hoobler's testimony, the sole basis for appellant's conviction, was insufficient to support the conviction. On the contrary, viewing the evidence in the light most favorable to the Commonwealth, we find Mr. Hoobler's testimony, which we have recounted, sufficient to support the jury's verdict.

As part of his argument on weight, appellant asserts that there are several possible alternative explanations for the fact that appellant's truck was not called out for snow removal until after he had made a contribution. This argument is totally devoid of merit. It has often been repeated that:

> "[I]t is the province of the trier of fact to pass upon the credibility of witnesses and the weight to be accorded the evidence produced. [Citations omitted.] The fact-finder is free to believe all, part, or none of the evidence. [Citations omitted.]" *Commonwealth v. Rose,* 463 Pa. 264, 268, 344 A.2d 824, 826 (1975).

Furthermore, Mr. Hoobler's unshaken testimony that appellant approached him on one occasion to seek an additional contribution was alone sufficient to convict appellant.

 Appellant's final contention is that the court below erred in failing to grant a preliminary hearing and in failing to quash the indictments for lack of a preliminary hearing. *Commonwealth v. McCloskey, supra,* conclusively established

that "an investigating grand jury presentment is a constitutionally permissible and reasonable alternative to a preliminary hearing. *Id.* 443 Pa. at 140, 277 A.2d at 776. Therefore, appellant's argument has no merit.

The judgment of sentence is affirmed.

JACOBS, President Judge, joins in this opinion.

SPAETH, Judge, in support of affirmance:

The opinion in support of reversal is based on the assumption that a legally sufficient petition by the district attorney must be filed before a special investigating grand jury may be convened. I suggest that that assumption is at least questionable. In *In re: Jan. 1974 Phila. Co. Gr. Jury Inv.*, 458 Pa. 586, 328 A.2d 485 (1974), the Supreme Court held (albeit by a 4–3 vote) that a judge could on his own motion instruct a grand jury to conduct a special investigation. The Court did say that the judge must have before him information sufficient to satisfy the requirements of *Commonwealth ex rel. Camelot Det. Agency, Inc. v. Specter,* 451 Pa. 370, 303 A.2d 203 (1973). However, it did not say that the judge must make this information public.

I grant that *Jan. 1974 Gr. Jury* may be distinguished on the ground that there the judge did not *convene* a special investigating grand jury but only *instructed* a regular grand jury that had *already* been convened. This distinction, however, seems more formal than substantive, and I think it clear that the Supreme Court has minimized, if not eliminated, the significance of the petition by the district attorney. I therefore conclude that we should not hold a petition inadequate where, as here, its holes were filled in by information presented to the convening judge.

A second issue must be considered, however. Appellant argues that the indictment returned by the regular grand jury should be quashed because he was denied a preliminary hearing. Since those who are in support of reversal have concluded that the special investigating grand jury was improperly convened, they find it unnecessary to consider

this argument. Judge PRICE in his opinion in support of affirmance considers it, and rejects it on the strength of *Commonwealth v. McCloskey*, 443 Pa. 117, 277 A.2d 764, *cert. denied*, 404 U.S. 1000, 92 S.Ct. 559, 30 L.Ed.2d 552 (1971).

The same problem arose in *Commonwealth v. Levinson*, 239 Pa.Super. 387, 362 A.2d 1080 (1976). There I submitted that "recent developments in the law suggest that the holding of *McCloskey* might be reconsidered." 239 Pa.Super. 908, 362 A.2d at 1092 (concurring and dissenting opinion). I went on to discuss what those developments were, and see no need to repeat that discussion here. The Supreme Court granted allocatur, and affirmed. *Commonwealth v. Levinson*, 480 Pa. 273, 389 A.2d 1062 (1978) (ROBERTS, J., and POMEROY, J., each filed a dissenting opinion; O'BRIEN, J., joined both dissenting opinions). This meant that the indictment in question was quashed. As it happened, however, the Supreme Court did not find it necessary to reconsider *McCloskey*, instead basing its order on the fact that six members of the special investigating grand jury had not heard all the evidence leading up to the presentment.

Since *Levinson* there has been a further development in the law, which I believe should be noted. In *Hawkins v. Superior Court*, 22 Cal.3d 584, 150 Cal.Rptr. 435, 586 P.2d 916, 47 L.W. 2351 (U.S.L.W. Dec. 5, 1978), the California Supreme Court held that the equal protection provision of the California Constitution requires that an indicted defendant be allowed the same sort of preliminary hearing as is allowed a defendant prosecuted by information. Under California procedure, a defendant prosecuted by information is entitled to a preliminary hearing at which he is provided with information about the government's case and there is a determination of probable cause by a neutral magistrate, while an indicted defendant was given no hearing but was only entitled to a transcript of the grand jury proceeding. Thus the parallel with Pennsylvania procedure was exact.

In holding this difference of treatment a denial of equal protection, the California Supreme Court stated: [1]

> [Text] The Attorney General further assumes * * that the likelihood of a probable cause finding is substantially the same whether the screening function is performed by the grand jury with subsequent judicial review or by a magistrate at a preliminary hearing. This assumption reflects the idealistic concept that the grand jury is an independent body of citizens, standing as a buffer between the state and the individual and protecting the innocent from unfounded accusations of crime. Unfortunately, grand jury proceedings today are structured in a manner that renders fulfillment of the ideal unattainable. *. * * The grand jury is independent only in the sense that it is not formally attached to the prosecutor's office; though legally free to vote as they please, grand jurors virtually always assent to the recommendations of the prosecuting attorney, a fact borne out by available statistical and survey data. * * * [End Text]

This problem derives at least in part in the fact that the grand jury is expected to serve two distinct and largely inconsistent functions—accuser and impartial factfinder. It seems self-evident that to the extent it succeeds at one function it fails at the other.

> [Text] It is clear from the foregoing that a defendant charged by indictment is seriously disadvantaged in contrast to a defendant charged by information. * * * Indeed, current indictment procedures create what can only be characterized as a prosecutor's Eden: he decides what evidence will be heard, how it is to be presented, and then advises the grand jury on its admissibility and legal significance. In sharp contrast are information procedures in which the defendant is entitled to an adversarial, judicial hearing that yields numerous protections, including a far more meaningful probable cause determination.

---

1. As I write, no copy of the Supreme Court's opinion is available, and I quote from Law Week.

Yet the prosecuting attorney is free in his completely unfettered discretion to choose which defendants will be charged by indictment rather than information and consequently which catalogue of rights, widely disparate though they may be, a defendant will receive. [End Text]

The rights lost by indicted defendants through being denied a postindictment preliminary hearing are fundamental, and thus the strict scrutiny tier of equal protection analysis is applicable. The few tactical advantages gained by the prosecutor by using the indictment procedure do not amount to a constitutionally compelling state interest that justifies depriving an indicted defendant of these fundamental rights. Nor does the Attorney General make any effort to show that this discrimination is constitutionally necessary to preserve these advantages.

This analysis is based on *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970). I am aware that in deciding *McCloskey*, the Supreme Court considered *Coleman*, and found it not controlling. 443 Pa. at 139–40, 277 A.2d at 775. Even so, I respectfully submit that the analysis by the California Supreme Court is powerful, and when added to the developments noted in *Levinson*, may lead to *McCloskey* being reconsidered. In the meantime, of course, this court must follow *McCloskey*. I therefore agree with Judge PRICE that appellant's argument that the indictment should be quashed because he was denied a preliminary hearing must be rejected.

It only remains to decide whether the trial on the indictment was proper. On this issue, I join Judge PRICE's opinion.

The judgment of sentence should be affirmed.

HESTER, Judge, in support of reversal:

Appellant Jack Bestwick appeals from the judgment of sentence entered by the Mercer County Court on July 28, 1977, following conviction by a jury of one count of macing.[1]

---

1. Act of April 6, 1939, P.L. 16, § 1 (25 P.S. § 2374) provides:

 It shall be unlawful for any political committee or any member, employe or agent thereof, or for any public officer or employe, or

The investigations, indictments, and conviction of appellant and several co-defendants evolved from a special investigative grand jury convened upon petition of the Mercer County District Attorney in June, 1975. On this appeal, appellant contends the District Attorney's petition was insufficient as a matter of law to impanel the grand jury and that his subsequent indictment and conviction cannot stand. We agree and will reverse.

On June 2, 1975, the Mercer County District Attorney, acting on rumors, newspaper reports, and legislative investigations, filed a petition for an investigative grand jury to probe allegations of macing among employees of the Pennsylvania Department of Transportation (PennDOT) for political donations.[2] Specifically, the petition alleged that certain "supervisory personnel have extorted political assessments from persons seeking contracts with [PennDOT] . . [T]here is evidence that one or more private operators of snow removal equipment have been required to pay $100.00 in order to lease equipment to the Commonwealth." The

any other person whatsoever, directly or indirectly, to demand from any public officer, subordinate or employe holding any office, or position of honor, trust or profit under this Commonwealth, or otherwise engaged or employed in the service of the Commonwealth, or employed by, or in any way engaged in the service of, any political subdivision, or from any person receiving any public assistance whatsoever from the Commonwealth or the United States, directly or through employment on public works, or any person, association or corporation desiring or having a contract with, or a certificate, license or permit from, the Commonwealth or any political subdivision, any assessment or percentage of any money or profit, or their equivalent in any thing of value, with the understanding, express or implied, that the same may be used or shall be used for political purposes: Provided, however, That nothing in this act contained shall be construed to prohibit voluntary contributions to any political committee or organization for legitimate political and campaign purposes to the extent such contributions are not prohibited by law.

2. In 1974, a Special Legislative Investigating Committee, the so-called "Gleason Committee", held hearings to probe contracting policies within PennDOT. The Mercer County D.A. was apparently able to obtain extracts of the committee testimony and relied in large portion on that testimony.

petition averred these were not isolated instances, "but rather are part of a widespread and systematic scheme" of extortion and that "the subject matter of this investigation affects the community as a whole." Finally, the petition stated the "ordinary processes of law were inadequate to cope with this investigation," and included this contention:

Your Petitioner believes that after a grand jury investigation there will be enough evidence to obtain at least one indictment on each of the above named specific offenses. In order to protect the rights of those persons involved in the above named offenses, your petitioner has refrained from inserting names in this petition. Your Petitioner is prepared, however, to present documentary evidence to the Court, if the Court so desires, in support of the above charged offenses. Said documents and evidence would include the names of the alleged actors and victims, as well as the facts and circumstances surrounding the commission of the offenses.

The petition made no reference to the time the alleged offenses are to have occurred, nor did it name any individuals suspected of wrongdoing or suspected of being victims of wrongdoing. Further, aside from allegations that PennDOT officials from Mercer County were involved, there were no averments that the macing itself occurred within Mercer County.

The lower court, aware of these deficiencies in the petition, and in reliance on the above quoted paragraph, held an in-camera hearing on June 3, 1975 to "review the evidence of the District Attorney". Following the hearing, at which the District Attorney produced various documents, exhibits, and statements, the court entered an order granting the petition. A number of presentments by the grand jury followed, recommending, *inter alia*, that appellant be indicted for macing, bribery, extortion, and conspiracy. A motion by appellant to dismiss the presentments was denied. The

September, 1975 indicting grand jury[3] returned indictments against appellant and other PennDOT officials charging the crimes recommended in the presentments. Motions to quash, alleging defective procedures in impaneling the grand jury, were denied and the cases proceeded to trial. The jury acquitted appellant's co-defendants of all charges and found appellant guilty of one count of macing. Motions for a new trial and arrest of judgment, in which appellant again challenged the legality of the grand jury, were denied. Appellant was ordered to pay a fine of $300.00 and to undergo imprisonment for three months to one year. This appeal followed.

It is to be observed initially that use of the investigative grand jury is a departure from the usual modes of instituting criminal proceedings.[4] As such, it is viewed as an "emergency weapon" to be used "sparingly and with great caution" *In Re Petition of Grace*, 397 Pa. 254, 154 A.2d 592 (1959), and only where " 'the public interest would suffer from the delays incident to the ordinary forms of law' ", *Commonwealth v. McCloskey*, 443 Pa. 117, 134, 277 A.2d 764, quoting *McNair's Petition*, 324 Pa. 48, 187 A. 498 (1936). Because of its inquisitorial function and potential for casting "clouds of suspicion" on those it investigates, *McNair*, supra, the grand jury's freedom to probe has been severely restricted in this Commonwealth. Our Supreme Court has recently redefined the minimum requisites that must be set forth in the District Attorney's petition[5] for the calling of a grand jury investigation:

**3.** For the distinction between an indicting grand jury and an investigative grand jury, see *Smith v. Gallagher*, 408 Pa. 551, 185 A.2d 135 (1962).

**4.** For a review of the norm and its several exceptions, see *Commonwealth v. McCloskey*, 443 Pa. 117, 130–1, 277 A.2d 764, 770–1 (1971).

**5.** Petition by the District Attorney is only one mode by which a grand jury investigation may be invoked. Private citizens may present a memorial requesting a grand jury, see, e. g., *Memorial of Citizens Association*, 8 Phila. 478 (1870), or the court, on its own motion may order such an investigation, see, e. g., *In Re Investigation of January 1974 Phila. County Grand Jury*, 458 Pa. 586, 328 A.2d 485 (1974). Cf. Ranney, Grand Juries in Pennsylvania, 37 U.Pitt.L.Rev. 1 (1975). See

(a) the subject matter of the investigation must affect the members of the community as a whole, rather than as individuals; (b) the investigation must be aimed at conditions and not primarily at individuals; (c) the ordinary processes of the law must be inadequate to cope with the problems; (d) the investigation must have a defined scope, be aimed at crimes, and supported by information indicating the existence of a system of related crimes or widespread conspiracy; (e) information as to the crimes must come from direct knowledge or a trustworthy source.

*Commonwealth ex rel. Camelot Detective Agency, Inc. v. Specter*, 451 Pa. 370, 374, 303 A.2d 203, 205 (1973); *Commonwealth v. McCloskey*, supra; *Commonwealth v. Barger*, 249 Pa.Super. 59, 375 A.2d 756 (1977).[6]

With respect to requirement (d), our courts have long held that, for the petition to have a defined scope, it must specifically set forth the place where and the time when the alleged violations of the law were committed. *In Re Investigation by Dauphin County Grand Jury (I)*, 332 Pa. 289, 300, 2 A.2d 783, 789 (1938). The petition must thus suggest that the crimes were committed within the jurisdiction of the invoking court and that prosecution will not be barred by the statute of limitations. See, Segal, supra at 91. In *Dauphin County (I)*, supra, the Supreme Court found the District Attorney's petition insufficient as a matter of law for failing to specify in any of the charges the time or place of the offenses.

In addition, the petition must name an individual or individuals who have committed criminal acts as well as at least one person who will testify as to the illegal acts. *Dauphin County (I)*, supra, 332 Pa. at 307, 2 A.2d at 792. This requirement will not automatically convert the proceed-

also New Rules of Criminal Procedure 250–266 (eff. January 1, 1979) dealing with Investigative Grand Jury Procedures.

**6.** These requirements were adopted from an influential law review article, Segal, Spivack, and Costilo, Obtaining a Grand Jury Investigation in Pennsylvania, 35 Temp.L.Q. 73 (1961).

ing into one aimed at individuals instead of conditions, *Camelot*, supra, since "the acts of a named individual [may] have a widespread impact on the community." Segal, supra at 86. Thus, the focus of the investigation will remain on conditions, and not on individuals. "With a definite person to begin with [the grand jury investigation] may spread as a fan and include many others." *McNair's Petition*, 324 Pa. at 58, 187 A. at 503.

These requirements are indispensable in guiding the grand jury's probe "within prescribed limitations", *Commonwealth v. Hubbs*, 137 Pa.Super. 229, 242, 8 A.2d 611, 617 (1939) and preventing "unbounded investigation", *Dauphin County (I)*, supra. The grand jury must have a clearly marked path to confine its deliberations for it is "not a busybody" to roam at will without restrictions and appropriate safeguards. *Petition of Grace*, supra.

The instant petition is fatally flawed in failing to set forth the time of the alleged offenses or to name individuals suspected of engaging in crime or of being victims or witnesses to crime. Moreover, there is no allegation that criminal activity occurred within the jurisdiction of the Mercer County Court.[7] The District Attorney and the lower court were apparently aware of these shortcomings and attempted to remedy the defects via an in-camera hearing where supplementary documentation was introduced to buttress the averments in the petition. We can find no authority in support of such a procedure.[8] Further, caselaw makes it clear that legal justification for impaneling an investiga-

---

7. The petition does suggest that the perpetrators of the crimes are located within Mercer County, but does not aver the crimes were committed therein.

8. In *Dauphin County Grand Jury (II)*, 332 Pa. 342, 2 A.2d 802 (1938), it appears the lower court held a "private" meeting with the District Attorney concerning the amended petition. See fn. 1. However, it is clear that the purpose of that meeting was not to fill in gaps of a fatally flawed petition, for the Supreme Court had already approved the legal sufficiency of the petition in *Dauphin County (I)*, supra, 332 Pa. 289, 2 A.2d 783, (On Amended Petition).

tive grand jury must be found within the District Attorney's petition, and not in ancillary proceedings. In *Dauphin County (I)*, supra, the Supreme Court stated: "If the petition does not present matters sufficient to justify the investigation, or disclose matters within the jurisdiction of the court, the call could not lawfully have been made." 332 Pa. at 300, 2 A.2d at 789, and rejected the contention that it also consider the lower court's charge to the grand jury since the charge might limit the probe. And in *In Re Grand Jury Investigation of Conditions at Western Penitentiary*, 173 Pa.Super. 197, 203, 96 A.2d 189, 191 (1953), this Court stated: "The [District Attorney's] petition must be self-sustaining." Moreover, in cases approving or rejecting requests for grand juries, the courts have consistently narrowed their inquiry to the sufficiency of the petition or citizen's memorial. See *Camelot*, supra, *Petition of Grace*, supra; *In Re Philadelphia County, Grand Jury, April 1943*, 347 Pa. 316, 32 A.2d 199 (1943) (citizen's memorial); *Dauphin County (I)*, supra; *Commonwealth v. Barger*, 249 Pa.Super. 59, 375 A.2d 756 (1977). See also *Commonwealth v. Levinson*, 480 Pa. 273, 389 A.2d 1062 (1978) (subsequent proceedings do not cure irregularities or defects in functioning of grand jury), and *Commonwealth v. Soloff*, 175 Pa.Super. 423, 107 A.2d 179 (1954) (appellant's conviction of assault and battery reversed as not cognate to any offense disclosed by district attorney's petition requesting grand jury).

A vague, legally insufficient petition frustrates the grand jury's primary objective, which is "to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person." *United States v. Calandra*, 414 U.S. 338, 344, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974). Without a self-sustaining petition, the grand jury will lack "a sound, solid basis on which to proceed", *McNair*, supra, and run the risk of becoming an uncontrolled instrument. Since we find the instant petition deficient in several

important particulars, appellant's conviction cannot stand.[9] Judgment of sentence is therefore

Reversed.

CERCONE and VAN der VOORT, JJ., join in this Opinion.

---

**9.** The propriety of challenging the investigative grand jury on direct appeal from a judgment of sentence is not here questioned. Although the normal procedure is to request of the Supreme Court a writ of prohibition against further grand jury proceedings, see, e. g., *Philadelphia County Grand Jury*, and *McNair*, supra, one may also raise the grand jury's legality on appeal after conviction. *Commonwealth v. McCloskey*, supra, 443 Pa. at 135, 277 A.2d at 773. Timely objections, however, must be made to prevent waiver. *Commonwealth v. Schindler*, 170 Pa.Super. 337, 86 A.2d 151 (1952).