# Commonwealth v. Wecht

*Robert E. Colville, Charles A. DeMonaco, James B. Lees, Jr.* and *Anthony J. Krastek,* for Commonwealth.

*Stanley E. Preiser, Barbara H. Fleisher, John M. Feeney* and *Irvin S. Bails,* for defendant.

WALKER, *J., Specially Presiding,* February 27, 1981—Defendant, Cyril H. Wecht, former coroner of Allegheny County, has been charged in a four count information with various violations of the law relating to the operation of the Allegheny County Coroner's Office and certain private laboratory services offered by defendant, all of which are intertwined. The first count of the information charges theft of services under the Crimes Code, as amended, 18 Pa.C.S.A. §3926(b). The second and third counts allege that defendant submitted unsworn falsifications to public servants in violation of 18 Pa.C.S.A. §4904(a)(1). The last count relates to the alleged operation of an unlicensed clinical laboratory in violation of The Clinical Laboratory Act of September 26, 1951, P.L. 1539, as amended, 35 P.S. §2151 et seq.

This criminal prosecution had its genesis in the June 1979 Allegheny County Investigating Grand Jury which investigated, inter alia, the conduct of the Allegheny County Coroner's Office. The investigation into the coroner's office began in August of 1979 and resulted in a presentment against defendant being submitted to the supervising judge on September 3, 1980 which presentment was accepted by the supervising judge and filed on September 4, 1980.

Thereafter a criminal information was filed at the direction of the District Attorney of Allegheny County and a preliminary hearing held before a district magistrate resulting in the binding over of

defendant on the four counts presently before the court. Indicting grand juries being no longer in use in Allegheny County, the district attorney filed an information on or about December 18, 1980. Defendant has filed a comprehensive omnibus pretrial motion and an evidentiary hearing was held as to the multitude of issues raised by that motion which issues are now before the court for disposition. We will attempt to rule on those issues seriatim.

## MOTION TO QUASH AND DISMISS INFORMATION, COMPLAINT AND PRESENTMENT

Under this general heading, defendant has raised issues regarding the initial selection of the grand jury, the operation of the grand jury, alleged prosecutorial misconduct, including violations of the general secrecy rules applicable to investigative grand juries, and selective prosecution.

The Commonwealth initially objected to the grant of an evidentiary hearing as to matters relating to the conduct of the grand jury proceedings on the grounds that defendant's motion did not constitute a sufficient prima facie case to conduct any evidentiary hearing at all.

At the initial meeting between counsel and the court, after the writer of this memorandum was assigned to the case, it was not our understanding that the Commonwealth objected to the grant of any evidentiary hearing but only objected to the holding of such a hearing in advance of a general hearing on all omnibus pretrial motion issues. Since defendant ultimately withdrew his request for an earlier hearing, a general hearing on all pretrial issues was scheduled. Although the issue is now somewhat moot by the fact that such a hearing

has been held, we believe that in general, the grant of an evidentiary hearing is within the sound discretion of the court and that the decision to hold an evidentiary hearing was not an abuse of that discretion.

As a practical matter it has afforded defendant an opportunity to be heard as to many allegations which had been raised in the various pleadings and trumpeted to the public by the news media. In at least two of the cases relied on by the Commonwealth for its position: Com. v. Schwartz, 178 Pa. Superior Ct. 434, 115 A. 2d 826 (1955), and In re Grand Jury Investigation (Appeal of Lance), 610 F. 2d 202 (5th Cir. 1980), (hereinafter Lance), the holding of an evidentiary hearing was approved or required. In Schwartz, an evidentiary hearing had already been held by the trial court before the case reached the appellate level and that procedure was not criticized. In Lance, the Fifth Circuit Court of Appeals remanded to the district court to hold an evidentiary hearing.

At least one of the reasons for the remand in Lance was the failure of the government attorneys to file affidavits denying allegations that they were the source of certain secrecy leaks. Nonetheless, the court made it clear that such affidavits in and of themselves did not necessarily preclude the need for an evidentiary hearing. At page 221 the court said: "We leave for decision after a factual analysis by the district court the question whether the showing made by Lance would still warrant an evidentiary hearing even if a responsive affidavit should be filed by government counsel."

Lance is not entirely in point since the relief sought at the appellate court level was the imposition of sanctions upon counsel rather than a direct attack upon the proceedings against Bert Lance.

We believe that our decision to hold an evidentiary hearing was appropriate.

## THE SELECTION OF THE GRAND JURY

Defendant has attacked the method of selection of the grand jury and the computerized selection of the master list or jury wheel; the voir dire conducted by the supervising judge; and the actual selection of the 23 grand jurors and seven alternates chosen in accordance with the Investigating Grand Jury Act of November 22, 1978, P.L. 1148, 19 P.S. §265, now codified as 42 Pa.C.S.A. §4541 et seq. by Act No. 1980-142.

The jury commissioners of Allegheny County and James M. George, a senior systems analyst for the Court of Common Pleas of Allegheny County, were called to testify as to the manner of selection of the master list of jurors and in the terminology of an earlier day, the filling of the jury wheel and the selection of the particular panel of one hundred jurors from which the grand jury was selected. They testified that there were three sources used to obtain names for the overall jury pool: voters registration lists, telephone directories and Department of Welfare lists. The witnesses went into considerable detail as to how these were cross-checked, what percentages were used from each potential source and the complex computer process from which random selection was guaranteed. We would gain nothing by attempting to review that testimony in depth. Suffice it to say, there was nothing in the testimony that would indicate that the 100 potential jurors from which the June 1979 Investigating Grand Jury was chosen were anything but a totally random selection of names of citizens of Allegheny County, nor was there any evidence of any systematic exclusion of persons by reason of

race, color, creed or any other discriminatory practice.

The preparation of master lists, the filling of the jury wheel and the selection of jury panels is controlled by statute. As of the time of the performance of these functions as they relate to the June 1979 Investigating Grand Jury of Allegheny County, the statutory provisions were found in the Act of December 6, 1972, Act No. 292, as amended by the Act of July 16, 1975, P.L. 1376, 17 P.S. §1301 et seq. Defendant argues that the 1972 Act was an unconstitutional delegation of power and was, therefore, ineffective in repealing the earlier legislation regarding jury selection. This argument is not persuasive.

The Act of 1972, as amended by the Act of 1975, was repealed by JARA but the bulk of the operative sections regarding the selection of jurors was saved from repeal until June 27, 1980. In 1980 the legislature adopted Act No. 1980-78 effective June 26, 1980, the bulk of which became Chapter 45 of the Judicial Code, 42 Pa.C.S.A. §4501 et seq. Section 6 of that act provided that proceedings occurring between June 26, 1980 and January 1, 1981 if conducted in the manner authorized either by Act No. 1980-78 or any repealed act would be valid. We believe that the procedures utilized in Allegheny County prior to June 26, 1980 fully complied with the then existing law.

A complaint is made that the jury commission has abrogated its responsibilities in favor of a computer and its operator. Section 13 of the Act of 1972 specifically authorized the use of computer and data processing equipment. It would seem obvious that elected jury commissioners would in all likelihood not have expertise as systems analysts or computer programmers that would enable them to

personally use such devices or even perhaps to totally understand the system and programming of a computer. So long as the computer experts work under the general supervision of and in conformity with the orders of the jury commissioners, we find nothing abhorrent in that process.

Pa.R.Crim.P. 252 requires the jury commissioners to prepare two alphabetical lists of names of those persons drawn to serve as grand jurors and "[o]ne list shall be delivered to the sheriff of the respective county and the other to the clerk of the courts, who shall maintain a record of the list." From the evidence adduced, it would appear that a list was delivered to the sheriff since he in fact summoned the jurors to appear and 96 of the 100 did appear with the other four producing excuses of hospitalization, non-residence or the like to explain their absence. It is at least doubtful that any list was delivered to the clerk of courts or maintained by him. The list in the possession of the clerk of courts at the time of hearing had obviously found its way to his files long after the impaneling of the grand jury. However, this defect and any other real or asserted technical defects in the selection and summoning of the grand jury cannot be permitted to vitiate the proceeding.

Technical defects relating to the selection of the jury panel are not grounds for quashing any part of the proceeding unless some prejudice to defendant is established: Com. v. Baker, 185 Pa. Superior Ct. 515, 138 A. 2d 177 (1958); Com. v. Eberhardt, 164 Pa. Superior Ct. 591, 67 A. 2d 613 (1949); Com. v. Nye, 240 Pa. 359, 87 Atl. 585 (1913).

We have reviewed in camera the transcript of the proceedings at which the actual 23 grand jurors and seven alternates were drawn. We find no defect in those proceedings and hold that they were con-

ducted entirely in accordance with the provisions of the Investigating Grand Jury Act.

## THE GRAND JURY PROCEEDINGS

Defendant asserts that in the conduct of the grand jury proceedings secrecy was imposed where none is permitted; leaks developed where secrecy is required; unauthorized persons appeared before the grand jury; the grand jury was used as a discovery tool; notices of submission were not appropriately submitted and that all grand jurors who voted upon the presentment may not have heard all of the evidence in connection therewith.

Defendant ao atttacks the constitutionality of the Investigating Grand Jury Act. The Supreme Court of this Commonwealth has already passed upon the constitutionality of that act: In re Investigating Grand Jury of Philadelphia County, Appeal of Washington, 490 Pa. 31, 415 A. 2d 17 (1980).

The Investigating Grand Jury Act provides in 42 Pa.C.S.A. §4549(b) in part that:

"[A] juror, attorney, interpreter, stenographer, operator of a recording device or any typist who transcribes recorded testimony may disclose matters occurring before the grand jury only when so directed by the court. All such persons shall be sworn to secrecy, and shall be in contempt of court if they reveal any information which they are sworn to keep secret."

42 Pa.C.S.A. §4549(d) provides: "No witness shall be prohibited from disclosing his testimony before the investigating grand jury except for cause shown in a hearing before the supervising judge. In no event may a witness be prevented from disclosing his testimony to his attorney."

In the conduct of the investigating grand jury

proceedings out of which this criminal information grew, witnesses were routinely sworn to secrecy "except as provided by law" and the identities of the grand jurors has been kept secret. We find no legal support for those practices. It is conceded that no hearings were held before the supervising judge and no orders entered prohibiting witnesses from disclosing their testimony for cause shown. Nonetheless, each witness and each attorney representing a witness was required to take an oath of secrecy. The Commonwealth takes the position now that since the oath of secrecy contained the language "except as provided by law" it was really not an oath of secrecy at all because the law does not prohibit disclosure by a witness of his or her own testimony. We find that argument specious. The oath actually administered to witnesses and attorneys would certainly lead them to believe they were not permitted to disclose their testimony and few, if any of them, would have the temerity to test the meaning of the words "except as provided by law."

Further we find no support for the practice of maintaining secrecy as to the identity of the grand jurors. The Comonwealth's position has been that investigations of this grand jury include matters unrelated to the Allegheny County morgue and since some of those matters relate to violent crimes such as murder that it would in fact endanger the lives of the grand jurors were their identities generally known. Even conceding the possibility of risk to individual grand jurors, the grand jury secrecy that is discussed throughout our case law relates only to the proceedings before the grand jury. In Com. v. Columbia Investment Corporation, 457 Pa. 353, 369, 325 A. 2d 289 (1974), at fn. 17, Justice Roberts said:

"Four reasons for grand jury secrecy are usually

advanced. (1) The grand jurors should be free from the apprehension that their opinions and votes may subsequently be disclosed by compulsion; (2) The complainants and witnesses summoned should be free from the apprehension that their testimony may be subsequently disclosed by compulsion so that the state may secure willing witnesses; (3) The guilty accused should not be provided with information that might enable him to flee from arrest, suborn false testimony, or tamper with witnesses or grand jurors; (4) The innocent accused who is charged by complaint before the grand jury but exonerated by its refusal to indict, should be protected from the compulsory disclosure of the fact that he has been groundlessly accused." None of these reasons relate to the personal safety of the grand jurors, important as it may be.

At least by dicta the Supreme Court has condemned the practice. In Special Grand Jury Case, Petition of Grace, 397 Pa. 254, 261, 154 A. 2d 592 (1959), the court said:

". . . [W]e add our disapproval of impounding the names and addresses of the members of the grand jury. The effort to protect them is laudible but misdirected, for in times of stress citizens called upon for civic service mut expect to stand to and be known. Impounding the identity of the jury might of itself require the calling of a new group, as a majority who were willing to serve anonymously might be fearful or unwilling to do so when disclosed."

While we agree with defendant that some of the secrecy practices adopted in relation to the June 1979 Investigating Grand Jury of Allegheny County were improper, the writer of this memorandum is not the supervising judge of the investigating

grand jury and our only concern must be whether those practices in any way infringed upon the rights of this particular defendant. There was no evidence that those improper practices in any way prejudiced this defendant except to the extent that he or his counsel may have been thwarted in attempting to interview prospective witnesses who might offer exculpatory evidence to assist the defense. That problem can be resolved by making a judicial determination, which we do, that the so-called oath of secrecy taken by the witnesses and their counsel does not preclude them from discussing their testimony with defendant, his counsel, his investigators or anyone else, for that matter.

Defendant asserts that there have been leaks as to grand jury proceedings. First he points to the fact that the supervising judge, who is also the administrative judge of the criminal division of the court, in the late winter or early spring of 1980, contacted the various judges of the Criminal Division of the Court of Common Pleas of Allegheny County, Pa., to determine whether they would recuse themselves in the event of an ultimate trial of this defendant. While there is conflicting evidence as to exactly when this took place and the exact nature of the conversation between the supervising judge and the other judges of the criminal division, we do not believe that evidence establishes any improper leaks. We are not convinced that imparting information to the supervising judge of an investigating grand jury is a "leak" in the first place. In the very nature of things, the supervising judge is going to have to know much that is going on before the investigating grand jury. He swears the witnesses; he rules on motions to quash subpoenas; he reviews "Schofield" affidavits; and in the very nature of things must be apprised in considerable detail as to

the proceedings before the grand jury in order to make the proper rulings as its investigation proceeds. Even, however, if disclosures to the supervising judge were to be considered improper, he could not help but have realized at some stage in the proceedings that a likely ultimate defendant was Dr. Wecht, a person of considerable political and professional renown in Allegheny County and as Administrative Judge of the Criminal Division, it was certainly not improper for him to attempt to determine at as early a date as possible whether he had a judge within his division who was willing to try the case.

The other alleged leaks relate primarily to a newspaper article written by William McCloskey, a conversation between John McConaha, an employe of the Allegheny County Coroner's Office and one Harry Tkach, a Pittsburgh Post-Gazette reporter, and to alleged statements made by Patrick Thomassey, an Assistant District Attorney, to one Gerald Esposito. Taken in the light most favorable to defendant, Mr. McConaha testified that he talked to Tkach sometime in July of 1980 and that Tkach told him that he knew a presentment would be returned after defendant returned from the Democratic National Convention. Further he testified that on August 7 or 8 of 1980, Tkach told him that he had had lunch with someone close to the grand jury and that this defendant and one Jim Bentz (an associate of Dr. Wecht) would be "indicted."

As to the Thomassey incident, Mr. Esposito testified that he had known Thomassey for some years and that sometime in early 1980 in a restaurant owned by Thomassey's father, Thomassey told him that there were three or four questions that he (Thomassey) thought Dr. Wecht could not answer, but that he would get an opportunity to talk to the grand jury.

The McCloskey article appeared in the Tribune-Review, published in Greensburg, Pa., in the July 25, 1980 edition. That article indicated that defendant would be "accused of fraud, theft and conspiracy before a grand jury here within the next five weeks." It attributed its source as "one privy to the decisions of County District Attorney Robert Colville."

Lance, supra, construed F.R.Crim.P. 6(e) which forbids the disclosure of "matters occurring before the grand jury" by certain individuals. The same terminology is used in the Pennsylvania Investigating Grand Jury Act, 42 Pa.C.S.A. §4549(b). Although the sentence is not phrased in the same negative manner the act basically forbids the disclosure of "matters occurring before the grand jury" by certain persons.

Lance provided a five point test. First, there must be a clear indication that the media reports disclosed information about "matters occurring before the grand jury." Such matters must be distinguished from discussion of actions taken by government attorneys, and recommendations by attorneys which did not reveal matters which occurred before the grand jury, and statements of opinion as to an individual's potential criminal liability. Second, the newspaper articles or other dissemination of information must indicate that the source of the information is one of those proscribed. Newspapermen regularly attribute their knowledge to "sources close to the investigation" and similar vague representations. The article and its content must be carefully perused to determine whether the source is one of those forbidden by the law.

Third, at least in determining whether there is a prima facie case to warrant a hearing on the issue, the court must assume that the statements in the

news report are correct. Fourth, the nature of the relief requested should be considered. Where as here, the requested relief is the dismissal of the entire proceeding, defendant bears a heavy burden in attempting to justify such relief. And fifth, the court should weigh any evidence presented by the government to rebut the assumed truthfulness of reports which may otherwise make a prima facie case of misconduct.

The testimony offered on behalf of defendant fails to meet these requirements. The McCloskey article does not inherently show that its source was a prohibited one. McCloskey himself testified that he had never met any of the individual assistant district attorneys concerned with the investigation prior to the recent hearing. All of the Commonwealth attorneys involved in the matter denied any leaks by affidavit and most of them by personal testimony under skilled interrogation by defendant's counsel. Admittedly the revelation of McCloskey's actual source was precluded by the court's ruling in relation to the Pennsylvania Shield Law, but he did testify, at least in a negative fashion, that his sources were not Commonwealth attorneys. Neither the Tkach or Thomassey statements were revelations of "matters occurring before the grand jury." At most they may reveal opinions as to the potential criminal liability of certain individuals and at least to some degree they were inaccurate opinions. Taken as a whole, the evidence does not meet defendant's heavy burden in attempting to have the proceeding dismissed.

The notice of submission required under 42 Pa.C.S.A. §4550 was presented to the supervising judge. It was then apparently "filed" with the records of the investigating grand jury in the hands of the evidence custodian. The act requires that be-

fore submitting an investigation, "the Commonwealth shall submit a notice to the supervising judge." This was done. Subsection (b) then provides that "[a]fter the attorney for the Commonwealth has filed the notice submitting the matter to the investigating grand jury any or all of the investigative resources of the investigating grand jury may be used as regards the investigation." Defendant seizes upon the word "filed" asserting that this requires its filing with the clerk of courts and that only filing with the clerk of courts is "filing." We disagree. The act requires a submission to the supervising judge. Any document which is delivered to a judge is, we believe "filed." The clerk of courts is a ministerial officer of the court used for the purpose of accepting documents as part of court records. The clerk is not, however, the exclusive recipient of documents and many things are submitted or filed with a judge although they may ultimately repose in the custody of the clerk. The submission of the notice to the supervising judge and the ultimate lodging of that document with the evidence custodian amply complies with the statutory requirement.

Admittedly all of the grand jurors did not hear all of the evidence presented on each day of the investigation. There was testimony that those grand jurors who did not hear particular testimony were required to read transcripts of it. Defendant complains that there is no way of knowing that the required twelve grand jurors who voted the presentment against him heard all of the testimony, good or bad. The statute provides that fifteen members of the grand jury shall constitute a quorum and that a majority of the full investigating grand jury are required to issue a presentment. See 42 Pa.C.S.A. 4545(b).

This requirement is enlarged upon by Pa.R.Crim.P. 253(e) which maintains a quorum at 15, but requires an affirmative vote of 12 permanent members of the grand jury to return an indictment. (Since investigating grand juries do not return indictments, we assume that the use of that term in the rule is an error and will read it as meaning presentment.) Without the rule, at least in theory, after all the alternates were used up, the permanent grand jury could shrink to a total of 15 members and under the statute eight of those members could issue a presentment. In the instant case, the presentment shows that there was a quorum present and that 12 or more members voted to issue the presentment. There is no requirement either in the law or the rules that every grand juror who votes on the presentment must have heard all of the testimony. If that were true, it would vitiate the requirement that 15 members constituted a quorum.

It is to be expected that an investigating grand jury which may continue for as long as 24 months will meet with some of its members absent from time to time. In Com. v. Levinson, 480 Pa. 273, 389 A. 2d 1062 (1978), with three dissenting justices, the Supreme Court quashed a proceeding because six new grand jurors were introduced into the investigation after it was partially completed. Those grand jurors were read summaries of the earlier testimony. The Levinson court distinguished United States ex rel. McCann v. Thompson, 144 F. 2d 604, cert. denied., 323 U.S. 790, 65 S.Ct. 313, 89 L. Ed. 630 (2d Cir. 1944), on the ground that it related to an indicting grand jury. In Thompson Judge Hand held that the fact that all grand jurors did not hear all of the testimony, should weaken rather than strengthen the government's case

since it could be expected that all of the evidence presented to an indicting grand jury would be damaging. In the case of an investigating grand jury both exculpatory and inculpatory testimony would be heard during the normal investigation and, therefore, the introduction of six new grand jurors in the midst of the proceeding was fatal. Even in Levinson, however, at page 285, the court said:

"In the instant case, six of the jurors who voted on the presentment all missed the same testimony. Even if we were to apply the Thompson rationale, it would remain valid only when the collective memory of the grand jury remains intact despite the sporadic absences of various individual members. When a substantial percentage of the total membership of the jury is absent from a significant portion of the presentation of evidence, it can no longer be said with confidence that the deliberations were not affected."

Levinson, therefore, tacitly condones the sporadic absence of grand jurors from time to time and there is no evidence in this case that absences were more than sporadic. Further both the legislation and the Supreme Court Rules have recognized the possibility of absences by establishing a quorum of 15. By statute and by rule the "substantial percentage" of the jurors who should not be absent from a "significant portion" of the testimony has been fixed by the establishment of a quorum. We will, therefore, deny defendant's application to dismiss the proceeding on the grounds that all grand jurors did not hear all of the testimony.

Defendant has alleged that the district attorney improperly used the grand jury as a discovery tool in the preparation of the Commonwealth's case and

argues that the grand jury should only determine if criminal charges should be brought. The investigating grand jury addresses itself to a broad scope in both subject matter and time. It is not solely for the purpose of determining if criminal charges should be brought against a single defendant. It would be difficult, if not impossible, for any court to draw a line of demarcation as to when an investigation broad in scope should terminate. In United States v. Kovaleski, 406 F. Supp. 267 (E.D. Mich. 1976), the court held that it was improper to call a witness before a grand jury if the "dominant purpose" was to discover evidence for use in a pending criminal case against another individual. This is a far cry from the instant case. There is no indication that the district attorney's "dominant purpose" was anything other than a thorough investigation of the Allegheny County Morgue as he continued to call witnesses before the grand jury.

Defendant urges that the failure of the district attorney to designate certain assistant district attorneys in writing prior to the time they appeared before and were involved in the proceedings of the investigating grand jury introduced unauthorized persons into the grand jury room. Defendant relies in part on the provisions of 42 Pa.C.S.A. §8931 dealing primarily with the substitution of criminal informations for indicting grand juries. Subsection (i) of that section defines a "district attorney" as including "any assistant district attorney whose authority to act for the district attorney *under this section* is evidenced by a written designation executed by the district attorney or acting district attorney and filed with the clerk of the courts." (Emphasis supplied.) This definition relates to the signing of informations as a substitute for grand jury indictments. In adopting the Investigating Grand

Jury Act, the legislature used different language indicating that the "Attorney for the Commonwealth" was defined as the district attorney "or his designee." Had the legislature wished to require such designation in writing, it could have easily used the same words that it did in 42 Pa.C.S.A. §8931. Since the legislature did not require a written designation, we will not add that language to the statute by judicial construction.

A considerable amount of evidence was taken relating to defendant's charge of selective prosecution. Defendant attempted to show that numerous assistant district attorneys, although designated as "fulltime" by the office, carried on some private practice. There is no question from the evidence that at least some of the assistant district attorneys who testified have in the past and presently continue to carry on a private practice as long as it does not put them in a position of conflict of interest with the district attorney's office.

Apparently, at least until the beginning of the first term of the incumbent district attorney, it was expected that assistant district attorneys would also be permitted to carry on non-conflicting private practices. Sometime after Mr. Colville took office, he applied for funding through an L.E.A.A. grant in an effort to put most, if not all, of his assistants on a "fulltime" basis. Some individuals were "grandfathered" so that he would not lose all of his experienced trial assistants. There was certainly not any unanimity of opinion as to what the term "fulltime" meant. It was construed by some witnesses to permit private practice outside of normal working hours and by others to prohibit any private practice. It is certainly anything but clear from the testimony that what any of the assistant district attorneys may have done constituted criminal be-

havior. At the most there may have been documents typed either on county time or on the employe's own time by some of the secretaries working in the office which related to private legal matters.

Even assuming arguendo, that the services of county employes were in some way diverted to private legal practice, for selective prosecution to be a defense to a criminal charge more than uneven enforcement of the law is required. A defendant alleging such a defense must prove an element of intentional and purposeful discrimination before a violation of his constitutional rights can be shown: Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L. Ed. 220 (1886); U.S. v. Ahmad, 347 F. Supp. 912 (M.D. Pa. 1972); Com. v. Phillips, 248 Pa. Superior Ct. 400, 375 A. 2d 158 (1977); Oyler v. Boles, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed. 2d 446 (1962). Generally speaking the courts have required that the discrimination be deliberately based on such unjustifiable standards as race, religion or other arbitrary classification: Bordenkircher v. Hays, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed. 2d 604 (1978).

In United States v. Smith, 523 F. 2d 771, 782 (5th Cir. 1975), the impermissible motives were somewhat expanded in the following language:

"Moreover, the decision of whether or not to prosecute in any given instance must be left to the discretion of the prosecutor [citations omitted]. This discretion has been curbed by the judiciary only in those instances where impermissible motives may be attributed to the prosecution, such as bad faith, race, religion, or a desire to prevent the exercise of defendant's constitutional rights."

Throughout this case to date, in both legal pleadings and interviews with the news media, defendant has asserted that the entire case is a political

vendetta against him borne of a conspiracy of his political enemies including numerous elected officials of Allegheny County and the Commonwealth. Defendant was given every leeway at the evidentiary hearing (too much leeway in the eyes of the Commonwealth, we are sure) to prove those allegations.

In sum, the evidence established only that this defendant and certain of the individuals he accuses of conspiring against him have been political opponents in various political contests. Although defendant may not be universally loved by all of his past and present political opponents, there was simply no evidence to establish his conclusory allegations that this prosecution resulted solely from a political conspiracy. There is no evidence that the proceedings were conducted in bad faith or for the conscious purpose of violating defendant's constitutional rights and his assertions of selective prosecution are not borne out by the evidence adduced.

Underlying all of the other deficiencies in defendant's proofs relating to his motion to quash is the fact that the evidence shows no prejudice to defendant even assuming that there were irregularities in the proceedings. In Com. v. Schwartz, supra, at 443, the court said:

"In view of the nature of grand jury proceedings, prejudice may not be inferred but must be definitely established. 'A court should not sustain a motion to quash, based upon allegations of extraneous factors "except in a clear case where it is convinced that harm has been done to the defendant by improper conduct that interfered with his substantial rights": Com. v. Brownmiller, 141 Pa. Superior Ct. 107, 116, 14 A. 2d 907, citing Com. v.

Haines, 57 Pa. Superior Ct. 616, and Com. v. Viscount, 118 Pa. Superior Ct. 595, 179 A. 858'." See also Com. v. Evans, 190 Pa. Superior Ct. 179, 154 A. 2d 57 (1959).

## THE SUFFICIENCY OF THE EVIDENCE BEFORE THE COMMITTING MAGISTRATE

The question of the sufficiency of the evidence at the preliminary hearing is normally raised by a writ of habeas corpus while defendant is incarcerated: Com. v. Gordon, 254 Pa. Superior Ct. 267, 385 A. 2d 1013 (1978); Com. v. Loar, 264 Pa. Superior Ct. 398, 399 A. 2d 1110 (1979). This is true, of course, because the evil to be remedied is the wrongful pretrial incarceration of defendant. Where a defendant had been admitted to bail, it was earlier held that there was no necessity to test the legal sufficiency of the preliminary hearing prior to trial and the issue could not be raised, for example, on a petition to discharge defendant from bail: Com. v. Weinstein, 177 Pa. Superior Ct. 1, 109 A. 2d 235 (1954); Com. v. Smith, 212 Pa. Superior Ct. 403, 244 A. 2d 787 (1968).

In recent years this rule has been modified and it has been held that one who is held on bail is sufficiently restricted of his liberty to maintain an action of habeas corpus: Com. ex rel. Paulinski v. Isaac, 483 Pa. 467, 397 A. 2d 760 (1979); Com. v. Orman, 268 Pa. Superior Ct. 383, 408 A. 2d 518 (1979).

Defendant also argues that even though traditionally this issue should be raised by writ of habeas corpus and assuming that a writ of habeas corpus would lie regardless of defendant's unrestrained freedom, they were prevented by a stay of the Supreme Court from instituting such action. We seriously doubt that a stay order in this proceeding even

by the highest appellate court of the Commonwealth could suspend the rights of this defendant to a writ of habeas corpus, and we more seriously doubt that the existence of the stay would have deterred defendant's counsel in seeking the writ had they determined that that was an appropriate course.

We need not, however, base our denial of the motion on any narrow or technical grounds. The simple fact is that there is nothing before us upon which we could base an order relating to the sufficiency of the evidence before the committing magistrate. While undoubtedly a transcript was made of the evidence before the magistrate, it was not offered in evidence at the omnibus pretrial motion and is not a part of the record. We simply do not know what evidence was offered at the preliminary hearing and must, therefore, assume the regularity of that proceeding. The motion to quash on this ground will be denied.

This denial does not seriously prejudice defendant's rights. The merits of the case are still to be determined and although additional evidence may be introducd at trial that was not offered at the preliminary hearing stage, defendant will have his opportunity to test the sufficiency of that evidence by demurrer at the close of the Commonwealth's case or by motion in arrest of judgment following the conclusion of the trial.

## STATUTE OF LIMITATIONS

Defendant raises two issues concerning the statute of limitations. First, that the postponement provisions of the statute of limitations relating to public officials was improperly pled, and second that those postponement provisions are not applicable to one or more of the counts of this informa-

tion. We have some serious doubt as to whether, under the circumstances of this case, compliance with the statute of limitations must be pled by way of complaint or information. In Com. v. Cody, 191 Pa. Superior Ct. 354, 156 A. 2d 620 (1959), it was held that where an indictment shows on its face that more than two years has elapsed between the date of the indictment and the date of the alleged crime, the indictment must set forth the exception relied upon by the Commonwealth to toll the statute of limitations. In that case, however, the Commonwealth relied upon a tolling of the statute because of the fact that defendant had absconded or absented himself from the Commonwealth. Cases involving tolling of the statute of limitations are not necessary apposite with cases involving the postponement of the statute of limitations, the factual setting of the instant case.

In Com. v. Hylton, 8 Adams 50 (1966), Judge Sheely in a well-reasoned opinion either distinguishes, ignores, overrules or finds Cody to be dicta depending upon the eye of the beholder and decides that in similar circumstances the reasons for the tolling of the statute of limitations need not be pled.

The only other appellate court case which we have found which addresses the subject is Com. v. Bestwick, 262 Pa. Superior Ct. 558, 396 A. 2d 1311 (1978); 489 Pa. 603, 414 A. 2d 1373 (1980). In the Superior Court opinion in Bestwick, footnote 5 discusses the problem as it relates to the postponement of the statute of limitations as to public officers. While the footnote is unclear as to the status of pleading, it would appear that no allegation regarding the statute of limitations was incorporated within the indictment. In the Supreme Court opinion, the issue is given only cursory notice but the decision of the Superior Court is affirmed.

Even, however, if we were to conclude that the Commonwealth is bound to plead facts or legal conclusions which would establish that the prosecution was brought within the statute of limitations, the pleadings in this case have done so. Both the complaint and the information call attention to the postponement provisions of the statute of limitations as it applies to public officials and, therefore, defendant is clearly on notice of that issue and the Commonwealth's position in regard to it.

Defendant argues that the postponement provisions of the statute of limitations relating to public officials are not applicable to him in relation to some or all of these charges because the alleged criminal activity on his part was not done as a public official. The Commonwealth counters that no activity of a public official which is criminal in nature is within the purview of his official capacity, and therefore, if followed to its logical conclusion, defendant's argument would vitiate the provisions of the statute of limitations made applicable to such public officials. There is merit in each argument. It is true that nothing that a public official would do of a criminal nature would be within the scope of his authority as such public official. On the other hand, if a public official commits a crime totally unrelated to his public office, but for example, were to hide the loot of such crime in his office in the courthouse, that fact alone would not make the postponement provisions applicable.

It would appear that the count charging theft of services is inextricably entwined with defendant's public office. The count charging the operation of an unlicensed clinical laboratory is less clear. The two counts charging unsworn false statements are certainly to some degree divorced from the public

office. We believe, however, that the ultimate ruling on the effect of the statute of limitations, at least as to the second, third and fourth counts of the information, is dependent upon a factual determination and cannot be resolved at this stage in the proceedings. The motion to quash the information because of a bar of the statute of limitations will be denied at this time without predudice to the right of defendant to raise those issues at an appropriate time at trial.

## THE SUFFICIENCY OF THE INFORMATION

Defendant alleges that the informations are far too broad and vague and that they should therefore be quashed. Defendant has availed himself of all of the panoply of discovery proceedings available to criminal defendants and we find it difficult to believe that defendant is not fully apprised of the nature of the charges against him, and, therefore, the motion to quash on this grounds will be denied.

## MOTION TO SUPPRESS

Since the motion to suppress is based upon defendant's theory of the invalidity of the grand jury proceedings and further, that anything that flowed from it was "fruit of the poisonous tree," our previous discussion of the grand jury proceedings suffices to cover this issue. The motion to suppress will be denied.

## MISCELLANEOUS MATTERS

Items IV through XI and XIV of defendant's omnibus motion have either been covered by this memorandum or have been resolved by the agreement of the parties relating to discovery or by our order being filed simultaneously herewith relating

to discovery. Item XIII requesting special jury commissioners to draw a venire for the trial of this case is denied. We believe that from our previous discussion it is clear that the general method of selection of jurors is adequate to protect the rights of defendant. The panel of petit jurors for the March 23 date set for the commencement of the jury trial has already been drawn and if defendant has any special motions to present concerning that venire, such applications may be addressed to the court.

The motion for individual voir dire and the request to permit the defense counsel to have various persons seated with them at the counsel table during the selection of the jury will be granted. Given the pretrial publicity that this case has generated, it is appropriate to permit individual voir dire of all prospective jurors. All potential jurors except the juror under voir doir examination shall be excluded from the courtroom during the voir dire and counsel for the Commonwealth and defendant are directed to file with the court the proposed voir dire questions to be asked of individual jurors on or before March 16, 1981. The parties may have any experts or specialists sit with them at counsel table during the selection of the jury that they may desire provided that consultation with such experts or specialists shall not unduly delay the selection of the jury.

Item XVI of the omnibus pretrial motion requests the appointment of a special sheriff and custodian of the jury. It appears from our inquiries that, as in most, if not all, of the counties of this Commonwealth, juries in Allegheny County are in the custody of tipstaves under the control of the court and not in the custody of the sheriff. The jury shall be in the custody of the tipstaff under the direction of the court and not in the custody of any deputy sheriff

during the trial of the case. We see no present need for the presence of a deputy sheriff in the courtroom during the trial of the case and will, therefore, direct that the presence of a deputy sheriff is not required unless events during the trial should make such presence necessary.

The request in Item XVII for sequestration of the jury is denied at this time reserving to the court the right to sequester the jury if such action is deemed appropriate. We believe that the jury can be adequately instructed to refrain from reading, viewing or listening to news media reports of the trial and that the average juror of Allegheny County is sufficiently sophisticated to accept the instructions of the court and to deliberate and return a verdict based upon the evidence submitted to the jury in the courtroom without the necessity of sequestration. Because of the possible extended time required for trial, less jurors will be excused for hardship reasons if the jury is not sequestered, and a fairer trial will be afforded to defendant by non-sequestration of the jury.

In connection with his motion for sequestration of the jury, defendant made an oral motion at the time of hearing on the omnibus pretrial motion indicating that he would withdraw his motion for sequestration of the jury if the trial were held in the City-County Building rather than the Allegheny County Courthouse. In support of that motion, defendant indicated that the "Sheriff's Bullpen" was adjacent to the jury assembly room and permitted free intercourse between jurors and the deputy sheriffs. Because of the problems of logistics that would be encountered by moving the trial to the City-County Building, that motion is presently denied but we will require that the potential jurors in this case be sequestered in a room that is available

on the fifth floor of the Allegheny County Courthouse away from possible contact with the deputy sheriffs and our present intention is to hold the trial in a courtroom normally occupied by Judge Loren Lewis on the fifth floor of the Allegheny County Courthouse.

The request for sequestration of all witnesses contained in Item XVIII is granted and all witnesses for either side are ordered sequestered during the trial. The motion for daily trial transcripts contained in Item XIX is granted provided that the cost of such daily transcripts shall be borne by defendant.

## CONCLUSIONS

Because of the self-imposed time constraints in which this memorandum and order has been prepared, it is not as exhaustive as to all issues as it might have been. In the event any of the rulings made herein become the subject of appellate review, the court reserves the right to file a further memorandum concerning such issues. We have attempted to catalog and rule upon all of the myriad issues that have been fairly pled and as to which evidence has been adduced. Notwithstanding that effort, it is entirely possible that a discussion of some issue or issues important to a further disposition of the case have been missed. If either counsel feels that our memorandum and order has omitted any matter important to the ultimate trial of the case, they are invited to file a further application for disposition of such matters on or before March 11, 1981.

In conclusion we would do well to quote from Justice Roberts' dissenting opinion in Com. v. Levinson, supra, wherein he stated:

"In cases involving criminal charges of political and governmental corruption, delays like those found here are especially disturbing. Despite substantial expenditures of prosecutorial, law enforcement, judicial, and other public resources, the merits of the charges have long remained unresolved, denying both the Commonwealth and the accused the opportunity for timely vindication. Most unfortunate, this demonstrated lack of timely resolution undermines public confidence in the effective and equal administration of the criminal law."

## ORDER

And now, February 27, 1981, the following order is entered.

The motion to quash and dismiss the information and to quash and dismiss the underlying complaint and presentment is denied.

The motion to suppress evidence is denied.

The motion to require the Commonwealth to disclose the manner of selecting grand jurors is denied except insofar as such disclosure has already been made.

The motion to produce minutes of the grand jury proceedings is denied.

The motions to produce transcripts of evidence before the grand jury to disclose grants of immunity, leniency or plea bargains, to compel disclosure of exculpatory material and witnesses, or rap sheets, to compel disclosure of informers, to compel disclosure of mail cover, and to compel disclosure of information as to prospective jurors are all moot by reason of agreement between the parties relating to such disclosure or are disposed of in a separate order relating to discovery.

The motion to empty the jury wheel, appoint spe-

cial jury commissioners and refill the wheel is denied.

The motion for special jury commissioners is denied.

The motion for individual voir dire of jurors and to permit certain experts to assist the defense in the selection of jury is granted.

The motion for appointment of special sheriff and custodian of the jury is denied.

The motion for sequestration of the jury is denied reserving to the court the right to modify this order at any future time.

The motion for sequestration of witnesses is granted.

The motion for daily trial transcripts is granted subject to the provision that such transcripts shall be at the expense of defendant.

The motion to impose sanctions upon counsel for the Commonwealth is denied.

## ORDER SUR DISCOVERY

And now, February 27, 1981, the following order is entered as to defendant's discovery motion.

The request for information beyond that agreed to under Paragraph 1 of defendant's discovery motion is denied.

The additional request under Paragraph 3 of the discovery motion for the names and addresses of witnesses to be called on rebuttal is denied at this time for the reason that it would be impossible for the Commonwealth to anticipate the identity of such possible rebuttal witnesses. The Commonwealth is directed to furnish the names and addresses of all witnesses they intend to call in rebuttal at the time the calling of such witnesses in rebuttal becomes apparent to counsel for the Commonwealth.

The Commonwealth is directed to furnish names and addresses of any eye witnesses to the alleged offense known to the Commonwealth in accordance with Paragraph 8 of defendant's discovery motion whether or not the Commonwealth intends to call such witnesses at the time of trial. As used herein the term "eye witness" shall mean any person who has firsthand knowledge of any material fact relating to the case.

The Commonwealth is ordered to furnish any rap sheet or other information which would disclose criminal activity by any prospective Commonwealth witness in accordance with the request in Paragraph 18 of defendant's discovery motion.

The request to order the disclosure of the results of any background investigation conducted as to potential jurors is denied. Any similar request on the part of the Commonwealth is likewise denied.

Commonwealth is directed to prepare an exhibit list of all documentary exhibits to be introduced at trial and mark the exhibits prior to trial and to furnish a copy of the list to counsel for defendant. Commonwealth is not required to designate which count the particular exhibit relates to.

In accordance with Paragraph 22 of the discovery motion, if the Commonwealth intends to offer evidence relating to "regulations" or policy of the Department of Health or any other agency which are not part of any regulations published in the Pennsylvania Bulletin or the Pennsylvania Code, copies of such regulations or office policy shall be furnished to counsel for defendant.